**STATE of Tennessee, Appellee,**

v.

**Dennis E. DODSON, Appellant.**

Court of Criminal Appeals of Tennessee, at Knoxville.

Aug. 29, 1989.

Permission To Appeal Denied by Supreme Court Nov. 27, 1989.

Leroy Phillips, Jr., Leonard M. Caputo, Chattanooga, for appellant.

Charles W. Burson, Atty. Gen. & Reporter, C. Anthony Daughtrey, Asst. Atty. Gen., Nashville, Gary D. Gerbitz, Dist. Atty. Gen., Thomas J. Evans, Frank Groves, Asst. Dist. Attys. Gen., Chattanooga, for appellee.

## OPINION

JONES, Judge.

The appellant, Dennis E. Dodson, was convicted of aggravated assault, robbery with a deadly weapon, and assault with intent to commit rape by a jury of his peers. The jury also found that the appellant was a habitual criminal and sentenced him to life imprisonment for the offense of robbery with a deadly weapon. The trial court, finding that the appellant was a persistent offender and he committed especially aggravated offenses, imposed the following Range II sentences: ten (10) years in the Department of Correction for aggravated assault and fifteen (15) years in the Department of Correction for assault with the intent to commit rape.

The appellant appealed as of right to this Court following the denial of his motion for a new trial. Tenn.R.App.P. 3(b).

The appellant has raised two issues for review. He contends that (a) the State failed to establish beyond a reasonable doubt that he was sane when the offenses were committed; and (b) the trial court committed error of prejudicial dimensions in permitting the State to cross-examine a defense witness regarding other crimes he had committed.

The record reflects that the appellant's motion for a new trial and notice of appeal were not filed timely. The trial judge sentenced the appellant on December 15, 1987. The appellant's motion for a new trial was not filed in the cause until July 14, 1988, approximately seven months after sentencing. Consequently, the time for the filing of the notice of appeal was not tolled by the filing of the motion for a new trial.

A motion for a new trial is required to be filed within thirty (30) days of the date the order of sentence is filed in this cause.[1] The provision is mandatory; and the time for the filing of a motion for a new trial cannot be extended.[2] A motion for a new trial which is not timely filed is a nullity.[3]

A trial judge does not have jurisdiction to hear and determine the merits of a motion for a new trial which has not been timely filed.[4] The trial judge has no alternative but to dismiss the motion.[5] The fact that a trial judge erroneously considers and rules upon a motion that has not been timely filed does not validate the motion; and an appellate court will not consider the issues raised in the motion[6] unless the issue or issues would result in the dismissal of the prosecution against the accused.[7]

The failure to timely file a motion for new trial does not deprive this Court of jurisdiction.[8] The jurisdiction of this Court attaches with the timely filing of a notice of appeal.[9] However, the failure to timely file a motion for a new trial results in the waiver of those issues which may result in the granting of a new trial.[10] In the case sub judice, this Court can only consider the issue addressing the sufficiency of the evidence.[11]

A notice of appeal is required to be filed with the clerk of the trial court within thirty days after the entry of the judgment or order from which relief is sought.[12] Thus, the defendant is required to file the notice of appeal within thirty days from the entry of the order of sentence unless the defendant *timely* files a post-trial motion for (a) judgment of acquittal, (b) a new trial, or (c) arrest of judgment. The timely filing of these motions tolls the time for the filing of the notice of appeal.[13]

Since the appellant failed to timely file a motion for a new trial, the time for the filing of the notice of appeal was not tolled pursuant to Rule 4(c), Tenn.R.App.P. Thus, the notice of appeal was not timely filed.

There were two remedies available for the correction of this procedural fault. First, the appellant could have sought post-conviction relief pursuant to T.C.A. § 40–30–120. Second, the appellant could have filed a motion in this Court requesting that the timely filing of a notice of appeal be waived in the interest of jus-

---

1. Tenn.R.Crim.P. 33(b); T.C.A. § 40–35–401 (Supp.1988).

2. Tenn.R.Crim.P. 45(b); *State v. Davis*, 748 S.W.2d 206 (Tenn.Crim.App.1987); *State v. Givhan*, 616 S.W.2d 612 (Tenn.Crim.App.1980).

3. *State v. Davis*, supra; *State v. Blunkall*, 731 S.W.2d 72 (Tenn.Crim.App.1987); *State v. Lane*, 689 S.W.2d 202, 205 (Tenn.Crim.App.1984).

4. *State v. Williams*, 645 S.W.2d 258 (Tenn.Crim.App.1982). *See State v. Hunt*, 660 S.W.2d 513 (Tenn.Crim.App.1983); *State v. Todd*, 631 S.W.2d 464 (Tenn.Crim.App.1981); *State v. Simerly*, 612 S.W.2d 196 (Tenn.Crim.App.1980).

5. *State v. Williams*, 675 S.W.2d 499 (Tenn.Crim.App.1984). *See State v. Frazier*, 683 S.W.2d 346 (Tenn.Crim.App.1984).

6. *See* Tenn.R.App.P. 3(e); *State v. Davis*, supra.

7. *State v. Davis*, supra; *State v. Williams*, supra; *State v. Durham*, 614 S.W.2d 815 (Tenn.Crim.App.1981).

8. *State v. Givhan*, supra. *See State v. Pritchett*, 621 S.W.2d 127, 141 (Tenn.1981).

9. *State v. Givhan*, 616 S.W.2d at 613.

10. *State v. Williams*, supra; *State v. Durham*, supra.

11. *State v. Davis*, supra; *State v. Durham*, supra.

12. Tenn.R.App.P. 4(a); *State v. Hamlin*, 655 S.W.2d 200 (Tenn.Crim.App.1983).

13. Tenn.R.App.P. 4(c). *See State v. Hamlin*, supra.

tice.[14] The record does not reflect that the appellant invoked either remedy. However, this Court may waive the notice of appeal requirement on its own motion when it is in the interest of justice to do so. Since the appeal of the appellant has merit, it is in the interest of justice that the notice of appeal requirement be waived. However, our review will be limited to the issue addressing the sufficiency of the evidence.

On the evening of August 16, 1985, the appellant approached a convenience store carrying a rifle case in one hand and a book in the other hand. The convenience store clerk, who had been the victim of a recent robbery, became frightened when she noticed that the appellant was approaching the store. She immediately called her brother. Shortly thereafter she called the East Ridge Police Department.

When the appellant entered the store, the victim was on the telephone talking to the dispatcher of the East Ridge Police Department. She noticed that the appellant had left the gun case and book outside. After glancing around the store to see if anyone else was there, the appellant asked the victim whether the store was for sale. When the victim told the appellant the store was in fact for sale, the appellant began to query her about the store. The victim advised the appellant that all questions regarding the sale of the store would have to be addressed to her real estate agent. The appellant subsequently walked through the store, and, at one point, talked to a customer. When the customer was ready to leave the store, the victim convinced him to remain and assist her in monitoring the appellant's movements. Later, the appellant approached the victim, threw an open adult magazine on the counter in front of her, and he asked: "How do you like this?" The victim closed the magazine without comment. He also told the victim that her father, who worked in the store part-time, had placed three cases of beer in a back room at his request. He stated that he wanted to buy the magazine and the beer. He told her he would go outside to get his money while she brought the beer to the counter. According to the appellant, the purchase price of the beer, as agreed, was $10.00. The appellant then exited the store.

The appellant subsequently reentered the store with a Bible and a rifle. He placed the Bible on top of the magazine. There was a ten dollar bill protruding from the Bible. He then walked around the counter and cut the telephone cord while the victim was talking to the police dispatcher. He grabbed the victim around her waist and led her into a back room. The appellant admonished the victim not to make any noise. He told her the gun was loaded and threatened to kill her if she made a sound.

After the appellant and victim entered the room, the appellant closed the door and proceeded to slap and choke the victim. He hit her with such force she fell to the floor. When she began to cry, he again threatened to kill her. As the victim lay on the floor, the appellant sat on top her, began slapping one side of her head and then the other; and he attempted to remove her blouse. When she resisted, he grabbed her by the hair and began pounding her head against the concrete floor. Ultimately, he was successful in removing her blouse. As he was attempting to unbutton her jeans, a police officer kicked the door open and pointed his gun at the appellant. The appellant told the police officer: "Don't shoot; don't shoot; Jesus don't shoot me."

The appellant provided the police with his name, nickname, date of birth, place of birth, address, zip code, height, weight, social security number, and occupation. Enroute to the police station, the appellant stated that he was glad that the officer did not shoot him. After he arrived at the police station, he inquired as to the amount of his bond; and he told a police officer, who attempted to interview him with a tape recorder present: "You don't expect me to say anything on that tape, do you?" He also told an officer: "I won't serve a day for it; I'll plead insanity."

The appellant relied upon the defense of insanity. He presented several witnesses to support his defense.

14. T.C.A. § 27-1-123 (Supp.1988); Tenn.R. App.P. 4(a); *State v. Davis*, supra.

The appellant's former wife, Janet Dodson, noticed a change in the appellant during the months of July and August of 1985. She filed suit for divorce on July 16, 1985. According to Mrs. Dodson, the appellant was unable to sleep at night, he was apparently hyperactive, overly ambitious, and his goals were not realistic. As time progressed, he began to "talk in circles," repeat himself, and his conduct gradually became "very bizarre."

Approximately a week before the date in question, Mrs. Dodson went to her former residence at the request of the appellant. She found that personal effects had been strewn throughout the house. Much of the furniture was missing. She discovered that scraps of paper had been tacked to the living room walls. The appellant told her the scraps of paper "were his investments" and they "proved that he had become a millionaire." He also told her that he had been "called to help pave the way for Jesus to return to Earth." She observed the appellant conversing with a non-existent person; and she opined that he had not washed his clothes or taken a bath in at least a week. He later called her and asked to borrow $50.00.

During a family gathering on July 4, 1985, the appellant's father noticed that he was "real hyper" and "obsessed with talking about his business ... to the extent that it was just annoying." The appellant was "talking about being a millionaire" and what he intended to purchase with his money. Approximately ten days before the date in question, the appellant visited with his parents. At that time, he was in a "state of confusion" and appeared to stare through his father. The appellant could not distinguish between the contract to purchase the property in North Georgia and ownership of the property. His father attempted to advise him not to improve the property before actually purchasing it.

David T. Hawley, an attorney, met the appellant in June of 1985 when the appellant purchased two parcels of rental property. On July 19, 1985, the appellant went to Mr. Hawley's office after he discovered his wife had sued him for divorce. According to Mr. Hawley, the appellant was "very, very upset, very emotional and started crying." Hawley advised the appellant to obtain counseling. As time progressed, the appellant's condition deteriorated until he became irrational.

Ralph P. Hudlow owned approximately one and one-half acres in Catoosa County, Georgia. In the middle of July he entered into a sales contract with the appellant. The appellant gave Mr. Hudlow a deposit of $1,000 and was given sixty days to pay the balance of the sales price, $9,500.

On or about August 1, 1985, Mr. Hudlow went to inspect the property after receiving a telephone call. His inspection revealed that the appellant had used a bulldozer to destroy the road leading to a creek. A normal vehicle could not pass over the roadway. Also, the appellant had cut trees with an axe and chain saw, but there was no "rhyme or reason" to the tree cutting. A patio had been built with stones near the creek, and a dam had been built half way across the creek. A bird bath was on one side of the dam and a statue of a semi-nude woman on the other.

When the appellant went to Mr. Hudlow's home during the first week in August, Mr. Hudlow noticed a marked change in the appellant's appearance and condition. The appellant seemed to be agitated and was "sort of babbling." What the appellant said didn't make much sense. Hudlow concluded that the appellant wasn't rational.

Approximately a week before the event in question, the appellant went to a real estate office and discussed the north Georgia property with John S. Lee, a salesman. The appellant advised Lee that he had plans to develop the property, represented to be approximately 300 acres. He intended to finance the improvements by selling "bat guano", a valuable fertilizer, contained in caves on the property. He asked Lee and another employee of the real estate firm to loan him $50.00 so that he could excavate the "bat guano" from the caves. When Lee questioned him, he discovered the parcel was only one and one-half acres in size.

Lee characterized the appellant's proposal as "wild" and "really just bizarre." During the course of the conversation, which lasted for approximately forty-five minutes, the appellant "jumped around, go[ing] from one thing to another," and he "just didn't make sense."

On August 16, 1985, at approximately 11:00 a.m., Lt. Jimmy Gass of the East Ridge Police Department had an encounter with the appellant when he responded to a public drunk complaint. The appellant was standing in the parking lot of a convenience store when Gass arrived. The appellant, who was not wearing a shirt or shoes, was quoting scripture from his Bible. Gass, who had been a classmate of the appellant, asked him why he was barefooted. The appellant told him the "Lord made him take 'em off in Dalton [, Georgia]." As they conversed, the appellant "jumped from subject to subject." Gass left after determining that the appellant was not under the influence of alcohol or drugs.

Several people had encounters with the appellant after he was arrested.

Mr. Hawley visited the appellant on August 19, 1985, three days after his arrest. The appellant was emaciated and filthy. He didn't recognize Hawley. His statements to Hawley made "absolutely no sense," and Hawley could not "get anything comprehensible out of him." The appellant recited Bible verses, talked about millions of dollars, and how he and Hawley were going to be rich. Hawley expressed the opinion that the appellant was totally incompetent.

Mr. Hudlow saw the appellant twice following his arrest. On the first occasion, Hudlow was of the opinion that the appellant's condition had deteriorated since their previous encounter. The appellant appeared to be very upset and irrational. The appellant, Bible in hand, told Hudlow about the evils of pornography and his intention to preach against this evil. When Hudlow visited the appellant a few days later, his condition had deteriorated further. The appellant was not wearing shoes, his hair was unkempt, and he was almost incoherent. Hudlow subsequently went to see a local judge and requested that steps be taken to hospitalize the appellant due to his apparent mental illness.

The appellant called his father from the jail. He told his father that they were making a movie at the jail. The conversation revealed that the appellant didn't understand his predicament. The appellant wrote his father letters which were consistent with his mental illness.

The appellant has a history of mental disorders. In 1975 he was diagnosed as having a depression neurosis. This diagnosis was later changed to a psychosis depressive reaction. In 1981 he was diagnosed as having an adjustment disorder with mixed emotional features. In 1984 he was diagnosed as having an adjustment disorder with mixed emotional features as well as having a border line personality disorder.

The appellant was seen at the Joe Johnson Center following his arrest. Based upon the findings made at the Center, the trial court entered an order directing that the appellant be transported to the Middle Tennessee Mental Health Institute in Nashville for further examination and treatment.

The appellant was examined by Dr. John P. Filley, a psychiatrist and assistant superintendent of the Institute on September 23, 1985. On October 30, 1985, Dr. Filley expressed the opinion that the appellant was not competent to stand trial. On January 2, 1986, it was again determined that the appellant was not competent to stand trial. The appellant was transferred to Mocassin Bend Mental Health Institute in February of 1986 because he was in continuous need of medical treatment. He was not required at that time to be confined to a secure facility such as the Institute in Nashville.

Dr. Filley diagnosed the appellant's illness as a bi-polar disorder, manic type. The doctor described the illness as "very serious." Heavy doses of medication were necessary to remit the illness. While the appellant may have been able to understand his conduct was wrong on the date in question, Dr. Filley opined that he was

"quite unable to conform his behavior to the requirement of the law." Dr. Filley testified that the appellant's condition was not caused by substance abuse.

The observations and conditions related by the lay witnesses were consistent with and support the diagnosis of bi-polar disorder, manic type. Symptoms of the illness are the inability to sleep, hyperactivity, delusions, a term encompassing grossly false ideas and implausible, likely improbable statements, which cannot be supported, hallucinations, which includes conversing with a non-existent person, grandiosity, absurd exaggerations, as well as other symptoms.

While it was developed on cross-examination that a person afflicted with a bi-polar disorder may have periods of remission, Dr. Filley testified that "unquestionably he [appellant] was not in remission [when he committed the offenses], that his illness was—had been there for a couple of months previous, that it was continuing and he didn't remit until he had considerably more treatment." According to Dr. Filley, a bi-polar disorder develops rapidly within a short period of time until it reaches full blown proportions and "remains that way for an extended period of time." In summary, the illness comes and goes over a period of months as opposed to days.

In this jurisdiction there is a presumption, rebuttable in nature, that the accused in a criminal proceeding is sane. *State v. Clayton,* 656 S.W.2d 344, 345 (Tenn.1983); *Spurlock v. State,* 212 Tenn. 132, 134, 368 S.W.2d 299, 300 (1963). If evidence is introduced during the course of trial which raises a reasonable doubt as to the accused's sanity, the sanity of the accused becomes an element of the crime. *State v. Clayton,* supra at 346. When this occurs, the State must establish beyond a reasonable doubt that the accused could appreciate the wrongfulness of his conduct and had the capacity to conform his conduct to the requirements of the law. *State v. Clayton,* supra; *Graham v. State,* 547 S.W.2d 531, 543 (Tenn.1977). The State may meet this burden by introducing into evidence (a) opinion testimony that the ac-cused was sane, (b) the opinion of a lay witness that the accused was sane, if a proper foundation is laid, or (c) the acts or statements of the accused, occurring at or near the commission of the offense, which are consistent with sanity and inconsistent with insanity. *Edwards v. State,* 540 S.W.2d 641, 646 (Tenn.1976), *cert. denied,* 429 U.S. 1061, 97 S.Ct. 784, 50 L.Ed.2d 777 (1977); *State v. Green,* 643 S.W.2d 902, 913 (Tenn.Crim.App.1982).

In this case, the State attempted to establish the sanity of the appellant by introducing evidence of the appellant's acts during the commission of the offenses and the statements he made shortly after his arrest, that the appellant was under the influence of drugs, and the appellant's illness was in remission.

While it is true that the acts and statements of the appellant were consistent with sanity, they were not inconsistent with insanity. *State v. Green,* supra. As Dr. Filley stated, "Some mentally ill people perform in the same way most of the rest of us." However, such a course of conduct does not mean that these individuals have the capacity to appreciate the wrongfulness of their conduct or possess the ability to conform their conduct to the requirements of the law.

The record is devoid of evidence that the appellant was under the influence of drugs when he committed these offenses. As stated, Dr. Filley testified that the bi-polar disorder was not caused by drug abuse.

When an accused's mental illness is subject to remission, the evidence must establish that the accused's illness was not in remission when he committed the offense in question. *Forbes v. State,* 559 S.W.2d 318, 325 (Tenn.1977). Dr. Filley testified that a bi-polar disorder is subject to remission, but it was his unequivocal opinion that the appellant's illness was not in remission when he committed the offenses. The evidence supports his opinion. The record reflects that before the appellant's illness went into remission, he underwent continuous medical treatment for an extended period of time and he was given heavy doses of exceptionally strong medi-

cation. Dr. Filley described the remission as a "chemical remission."

In summary, the evidence presented by the State was not sufficient for the jury to have rationally concluded that the appellant was sane when he committed the offenses in question. Tenn.R.App.P. 13(e); *Jackson v. Virginia,* 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979).

The judgment of the trial court is reversed, and this cause is remanded to the trial court for further proceedings pursuant to T.C.A. § 33–7–303.

DAUGHTREY and BIRCH, JJ., concur.