IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs July 20, 2005

## STATE OF TENNESSEE v. JOSEPH GUNTER

**Direct Appeal from the Criminal Court for Fentress County**
**No. 8140     E. Shayne Sexton, Judge**

_____

**No. M2004-01519-CCA-R3-CD - Filed October 19, 2005**

_____

The defendant, Joseph Gunter, was convicted by a Fentress County jury of first degree felony murder and especially aggravated robbery, a Class A felony, and was sentenced to concurrent terms of life without parole and twenty years, respectively. On appeal, he contends that the jury was exposed to extraneous prejudicial information about his case; the trial court erred in various of its evidentiary rulings and made improper commentary on the evidence; the State deprived him of potentially exculpatory evidence by failing to perform scientific testing on physical evidence recovered from the crime scene and by withholding new evidence discovered after the trial; and the cumulative effect of the various errors resulted in the denial of his right to a fair trial. The State argues, *inter alia*, that the defendant's appeal should be dismissed because his motion for a new trial was untimely. We agree with the State, and, accordingly, dismiss the appeal.

**Tenn. R. App. P. 3 Appeal as of Right; Appeal Dismissed**

ALAN E. GLENN, J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS and ROBERT W. WEDEMEYER, JJ., joined.

Martha J. Yoakum, District Public Defender, and Leif E. Jeffers, Assistant Public Defender, for the appellant, Joseph Gunter.

Paul G. Summers, Attorney General and Reporter; Preston Shipp, Assistant Attorney General; William Paul Phillips, District Attorney General; John W. Galloway, Jr., Deputy District Attorney General; and Sarah H. West Davis, Assistant District Attorney General, for the appellee, State of Tennessee.

### OPINION

### FACTS

This case involves the bludgeoning death of the defendant's mother, Wanda Gunter, in her Jamestown home. On Sunday morning, February 4, 2001, several of the victim's relatives,

concerned because they had been unable to reach the victim all weekend, went to her apartment to check on her. When the apartment manager let them inside, one of them found the victim lying face down in a pool of blood on the floor of her bedroom with a bloody hammer beside her. The subsequent autopsy revealed she had died of blunt head trauma, with at least four separate injuries to her head caused by an object similar to a hammer. Although a number of empty jewelry boxes were scattered throughout the room and it appeared as if the victim's purse had been emptied, the victim's apartment was locked when her family arrived.

Meanwhile, on the previous day, the twenty-one-year-old defendant, who had been living with the victim, had aroused the suspicions of a Sevierville pawn shop owner by his repeated trips into the store to pawn jewelry. When Sevierville police officers responded to the scene, they found the defendant in another pawn shop nearby while his girlfriend and her children waited in the victim's vehicle parked outside. Initially arrested on an outstanding community corrections violation warrant, the defendant was questioned the next day about the murder and gave an initial statement in which he claimed the victim had planned to spend the weekend with his older brother and his children and had given him permission to borrow her vehicle while she was away. In that statement, the defendant said that the pawned jewelry was part of a collection he had been accumulating over the previous two or three years. However, when later informed that the victim had been found dead in her apartment with some of her jewelry missing, the defendant admitted he had stolen some of her jewelry and said that she had been with a man she had just met from Alcoholics Anonymous when he last saw her on Friday morning.

Later that day, the defendant, who had been told only that the victim had died of head injuries, gave another statement in which he confessed that he had hit the victim once in the back of the head with a hammer. He insisted, however, that the victim was already grievously wounded from self-inflicted hammer wounds at the time and implied that the blow he delivered was intended to end her suffering. According to the defendant, the victim had cancer, was taking a medication that caused her to hallucinate, and had been acting strangely all week. His statement reads in pertinent part:

> While in the living room, I head a pop coming from the bedroom. While I was going toward the bedroom where mom was supose [sic] to be sleeping, I heard another pop and mom trying to say something. As I entered the bedroom, I seen [sic] mom falling toward her right hand side. Mom fell into the dresser . . . . I seen [sic] mom bleeding from the back of her head toward the left side. She was holding the hammer in her left hand. When she fell, she fell face down. . . . After she fell, mom was gasping for air. Mom was pooping on herself and farting. Mom was shaking. She had a hold [sic] of the hammer still trying to hit herself. I fell back into the wall between the closet door and bedroom door where I had left the hammer. I remember just seeing flashes. I'm not sure if I passed out or not. I grabbed the hammer from mom's hand. I had to pry her four fingers from around the hammer. After I got it loose from her hand, mom was still moving her hand at her head like she was still trying to hit herself. I took the hammer and hit mom in the back of the head one time. Mom was

still trying to gasp for air. I cannot remember if I tossed the hammer or what, but I don't remember coming out of the bedroom with it. I stood there for a minute. I thought I would call my brothers and tell them what had happened but I thought they wouldn't believe me. I hit mom once because she was gurgling and twitching. Her head was pouring blood so bad. I thought I needed to get away. I decided to take mom's car, which she had previously given me the keys to borrow. When I got into the car, the gas hand was almost on "E" for empty. I went back inside the apartment and looked in mom's purse for money. I had gotten the purse from beside her bed. It fell off the bed after I was looking through it for some money. I had previously given $600.00 (five $100 bills and five $20 bills) to her. I didn't find any money in her purse. Instead, I took some jewerly [sic] from mom's jewerly [sic] case on her dresser.

The defendant stated he had stopped at several pawn shops to pawn some of the jewelry in order to obtain expense money for a weekend trip to Pigeon Forge with his girlfriend and her children.

At trial, the defendant acknowledged he had signed the statement but claimed that the words had been supplied and written by the Tennessee Bureau of Investigation ("TBI") agent who conducted the interview. The defendant testified, instead, that he had returned to the victim's apartment after a brief absence on Friday morning to find her "twitching and quivering" as she lay dying on her bedroom floor. He conceded he might have pushed the hammer to the side as he knelt beside the victim but he insisted that he had never hit her with the hammer. The defendant explained that he had taken the victim's jewelry and fled because he feared that he would be blamed for her murder.

In an effort to bolster the defendant's testimony and to create reasonable doubt about his guilt for the murder, defense counsel attempted to show that the manager of the victim's apartment complex, who had since been indicted for the murder of another resident, was the real culprit in the crime. To that end, he elicited testimony from various witnesses, including the defendant, about arguments the victim had been having with the apartment manager over the repair of her apartment's heat pump and the petition that the victim had circulated shortly before her death asking that the manager be replaced. Notwithstanding defense counsel's efforts, the jury convicted the defendant of both especially aggravated robbery and felony murder. The trial court entered the judgments on March 14, 2002, and on May 21, 2004, overruled the defendant's motion for a new trial. On June 21, 2004, the defendant filed a notice of appeal to this court.

## ANALYSIS

The defendant raises a number of issues on appeal. The State argues, however, that the defendant has waived the right to an appeal by his failure to timely file a written motion for a new trial. We agree.

Tennessee Rule of Criminal Procedure 33(b) provides that "[a] motion for new trial shall be made in writing, or if made orally in open court shall be reduced to writing, within thirty days of the date the order of sentence is entered. The Court shall upon motion allow amendments liberally until the day of the hearing of the motion for a new trial." Because the provision is mandatory, the time for filing a motion for new trial may not be extended. See Tenn. R. Crim. P. 45(b) (specifically excluding time for filing of a motion for a new trial from those time periods which court may, in its discretion, extend); see also State v. Martin, 940 S.W.2d 567, 569 (Tenn. 1997); State v. Dodson, 780 S.W.2d 778, 780 (Tenn. Crim. App. 1989). The thirty-day provision is jurisdictional, making the trial court's erroneous consideration of an untimely filed motion a nullity and preventing the defendant from raising on appeal any issues which should have been raised in the motion for a new trial. Martin, 940 S.W.2d at 569; Dodson, 780 S.W.2d at 780. Unlike the untimely filing of the notice of appeal, this court does not have the authority to waive the untimely filing of a motion for new trial. State v. Givhan, 616 S.W.2d 612, 613 (Tenn. Crim. App. 1980); see also Tenn. R. App. P. 4(a).

Defense counsel made an oral motion for a new trial on March 14, 2002, at the conclusion of the defendant's sentencing hearing. He did not, however, file the written motion until more than six months later, on September 24, 2002. The defendant's motion for a new trial was, therefore, untimely. As such, all issues are waived except sufficiency of the evidence and sentencing, see State v. Boxley, 76 S.W.3d 381, 390 (Tenn. Crim. App. 2001), neither of which is raised on appeal. Moreover, we decline plain error review of the issues the defendant raises in his brief because none rise to the level of affecting a substantial right which would necessitate review in order to do substantial justice. See Tenn. R. Crim. P. 52(b).

## CONCLUSION

We conclude that the defendant has waived his right to direct appeal by his failure to timely file his written motion for a new trial. Accordingly, we dismiss the appeal.

_____
ALAN E. GLENN, JUDGE

-4-