# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
November 19, 2008 Session

## STATE OF TENNESSEE v. JEREMY PAUL DUFFER

**Direct Appeal from the Criminal Court for Davidson County**
**No. 2006-B-1132    Monte Watkins, Judge**

---

**No. M2007-02359-CCA-R3-CD - Filed June 25, 2009**

---

A Davidson County Criminal Court jury convicted the appellant, Jeremy Paul Duffer, of the following indicted offenses: Seven counts of rape of a child, four counts of aggravated sexual battery, two counts of especially aggravated sexual exploitation of a minor, and two counts of failure to appear. After a sentencing hearing, the appellant received an effective sentence of one hundred thirty-seven years in confinement. On appeal, the appellant contends that the evidence is insufficient to support the convictions and that his effective sentence is excessive. Upon review, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court are Affirmed.**

NORMA MCGEE OGLE, J., delivered the opinion of the court, in which DAVID H. WELLES and JOHN EVERETT WILLIAMS, JJ., joined.

Cynthia Fort and Matthew Mayo, Nashville, Tennessee, for the appellant, Jeremy Paul Duffer.

Robert E. Cooper, Jr., Attorney General and Reporter; Cameron L. Hyder, Assistant Attorney General; Victor S. Johnson, III, District Attorney General; and Brian Holmgren, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

### I.  Factual Background

According to the indictments, the offenses occurred on dates between January 1, 2001, and February 5, 2004. At trial, the then sixteen-year-old victim, D.G.,[1] testified that he was born on February 6, 1991, and had his thirteenth birthday in 2004. In August 2001, when the victim was ten years old, he moved with his mother from Kansas to Nashville. The victim lived with his mother and older brother at the Arbors of Hermitage apartment complex and often went to the laundromat with his mother in order to wash clothes. The laundromat was beside the Game Keep, a store where miniature figures, card games, and board games were sold, and the victim began going into the store while his mother washed clothes. The appellant worked in the Game Keep, and the victim and the appellant became friends. Soon, the victim was visiting the store two or three times per week and was spending most of his weekends there. In August 2002, when the victim was eleven years old, he moved with his mother to Smyrna. One or two months after the move, the appellant bought a car because the victim's mother had a job and could not take the victim to the Game Keep. The appellant would drive the victim to the Game Keep and to the appellant's apartment, which was "down the road" from the store. The victim began spending most of his weekends at the appellant's apartment. The appellant shared his apartment with a roommate. However, the appellant had his own bedroom, and the victim slept in the appellant's bed.

The victim testified that at some point, the appellant began sexually abusing him. The victim's first sexual encounter with the appellant occurred in the appellant's car while the appellant was driving the victim to the victim's home. The appellant asked the victim if he could rub the victim's penis, but the victim said no. The appellant persisted and told the victim it would be "okay." The victim said that he "let him, I guess" and that the appellant stroked the victim's penis up and down. The victim's jeans were unzipped, and the victim had an erection. The victim stated that subsequent incidents of the appellant "masturbat[ing]" him occurred almost every time the victim spent the night at the appellant's apartment. The victim explained, "He touched me. And there were a couple of times where it was the other way around." Sometimes the appellant masturbated the victim before or after the victim changed into his pajamas. The appellant would stroke the victim's erect penis until the victim ejaculated, and the victim estimated that the appellant masturbated him about thirty times. The victim also stroked the appellant's erect penis, but the appellant never ejaculated. The victim said he masturbated the appellant more than a couple of times but "[n]ot nearly as much as it was the other way around."

The victim testified that the appellant also performed fellatio on him "[q]uite a few times" at the appellant's apartment. During the incidents of oral sex, the victim had an erection and ejaculated. The victim performed oral sex on the appellant "a couple of times." Although the appellant had an erection, he never ejaculated. The victim stated that he penetrated appellant's anus with his penis "more than once" and that he wore a condom and used lubrication. The appellant penetrated the victim's anus with the appellant's penis once or twice. The appellant showed the victim pornographic videos two or three times on the television in the appellant's bedroom, and they

---

[1] It is the policy of this court to refer to minor victims of sexual offenses by only their initials.

engaged in masturbation and oral sex while they watched the videos. The appellant also used a Polaroid camera to take nude photographs of the victim. The victim went on gaming trips to Memphis and Atlanta with the appellant, but another adult went with them.

The victim testified that he thought he was in the sixth grade when the abuse started and that the appellant "was bribing me with models and stuff like that from the store." The victim said the appellant gave him items from the store as a way of rewarding him for doing sexual acts with the appellant. At some point, the victim told his girlfriend about the abuse, and she encouraged him to tell his mother. The victim said that he was thirteen or fourteen years old when he told his mother about the abuse and that he did not tell her earlier because he was scared. Soon after the victim told his mother, he spoke with Detective David Zoccola. He talked with the detective one or one and one-half months after his last sexual encounter with the appellant, and no further abuse occurred after the victim spoke with the detective.

On cross-examination, the victim testified that his mother was comfortable with his going to the Game Keep, and he acknowledged that he and the appellant were good friends. He also acknowledged that he had given three different statements about the abuse and that there may have been discrepancies in the statements. For example, the victim told Detective Zoccola that the incidents of masturbation occurred five or six times, not thirty times as he had testified, and he later told Detective Zoccola that the masturbation incidents occurred twenty times. The victim also told Detective Zoccola that he performed oral sex on the appellant five or six times, but he later told the detective that he performed oral sex on the appellant twenty times. The victim acknowledged that in a statement he gave to the Smyrna Police, he said the first masturbation incident occurred in the appellant's car in December 2003. The victim turned thirteen years old only two months later in February 2004.

On redirect examination, the victim testified that he spoke with the Smyrna Police on August 24, 2004, before he spoke with Detective Zoccola. He said that his sexual activity with the appellant progressed from masturbation to oral sex to anal sex within a period of several months and that the activity was "continuous" during that time. The victim said that he told the appellant he wanted to stop having sex but that the appellant "kept asking" and "would just keep trying to bribe me." The appellant did not force the victim to participate in the sexual activity but pressured him by asking for it continuously.

Angela Gschwind, the victim's mother, testified that she met the appellant about November 2001, when the appellant was working at the Game Keep next to the laundromat. While she did laundry, the victim went into the gaming store. Although the victim's mother stopped washing clothes at the laundromat, she continued to take the victim to the Game Keep to play games. She thought he was safe at the store because his friends were there and an adult watched over the children.

Gschwind testified that the appellant "took [the victim] under his wing" and "integrated himself rather quickly into our family." She stated that the appellant was a father figure to the

victim, and the victim "absolutely adored" him. Before the family moved to Smyrna in August 2002, the victim began bringing home items from the store. Gschwind said that the items "kept getting bigger and more and more frequent" and that she thought "it was a little odd at first." When she questioned the appellant about it, he explained that the victim received the items for working in the store. The victim's mother told the victim that she did not think he should accept them. After the family moved to Smyrna, the appellant bought a car in order to drive the victim to and from the Game Keep. Gschwind said that she attended a gaming conference with the victim in Atlanta but that the appellant did not attend the conference with them. In 2003 or 2004, the victim went with the appellant to a gaming conference in Memphis.

Gschwind testified that about a year into the appellant's and the victim's friendship, she became concerned about their relationship. She explained that one time, the appellant brought the victim home and reached "to give him a pat or to rub him on his back and [the victim] got really tense." Gschwind later asked the victim why he had tensed up, and he became very upset with her. She then "flat out" asked the victim if something inappropriate was going on with the appellant, and the victim became upset. Later that week, she spoke with the appellant about her concerns. The appellant was offended, said he loved the victim like a son, and told her that she had nothing to worry about. The appellant also told her that "even if he wanted to . . . he was rendered sexually incompetent because of an accident he had." She stated that her conversation with the appellant occurred sometime in 2002 or 2003 and after she and the victim moved to Smyrna. Between February 2004, when the victim turned thirteen, and August 2004, when Gschwind learned about the abuse, the victim visited the appellant often. However, as the victim's 2004 summer vacation approached, Gschwind "scaled back" the victim's contact with the appellant because the appellant was becoming aggressive in his demands to spend time with the victim.

Gschwind testified that the victim told her about the abuse in August 2004 and that she contacted the Smyrna Police. The Smyrna Police contacted the Davidson County Police within a month. Gschwind agreed to wear a body wire for Detective Zoccola and confront the appellant. She invited the appellant to lunch, and the police recorded the conversation she had with the appellant in her car. She stated that she did not pressure or threaten the appellant and that he made some admissions.

On cross-examination, Gschwind testified that parts of the appellant's relationship with the victim were a good influence on the victim. After she learned about the sexual abuse, Gschwind became concerned about the victim's behavior. She said the victim "wrote things down," and she characterized the writings as "doodlings in a notebook." She said that the victim "exhibited typical signs of someone that is in danger of committing suicide," that he had nightmares, and that he would not sleep. However, Gschwind never showed the victim's writings to the police and threw them away. When Gschwind met with the appellant and confronted him about the victim's allegations, she told him the victim had journals or diaries and had threatened to commit suicide. She acknowledged that those claims were not completely true. However, the claims resulted in the appellant's making a statement to her about his relationship with the victim. She said that the victim did not spend every weekend at the appellant's apartment as the victim had testified and that

-4-

"[c]ertain months he didn't spend any time over there at all. Other months he may have spent three weekends over there."

On redirect examination, Gschwind acknowledged that she prepared a document for Detective Zoccola, outlining how often the victim spent the night at the appellant's home. After reviewing the document, Gschwind stated that between January 2002 and December 2003, the victim spent at least one night per week at the appellant's apartment.

The State played the audiotape of Gschwind's recorded conversation with the appellant for the jury. During the conversation, Gschwind asked the appellant to "help me understand some of the things [the victim] wrote," and she told the appellant that "[t]here's some stuff in there about you guys touching each other." The appellant told Gschwind that he loved the victim "more than anything" and that the victim had been concerned the victim was bisexual. The appellant said that he masturbated the victim but that he did not know why he did it. When the victim's mother asked the appellant if the appellant had done more than masturbate the victim, the appellant stated, "I think we did pretty much everything." The appellant said that he did not penetrate the victim but that the victim penetrated him a couple of times. He stated that the victim wanted to penetrate him and that the victim asked him to buy condoms "so [the victim] could do it." The appellant said that he and the victim had sex for a couple of months and that he was trying to make the victim happy. His first sexual encounter with the victim occurred after the victim's family moved to Smyrna, "maybe about a year and a-half ago." He said he knew his sexual activity with the victim was wrong.

Detective David Zoccola of the Metropolitan Nashville Police Department's Sex Crimes Unit testified that the Smyrna Police Department took the original report in this case. When the Metro Police received the report, the case was assigned to Detective Zoccola. In September 2004, he spoke with the victim and the victim's mother. The victim said the masturbation incidents occurred about twenty times, that the oral sex incidents occurred about twenty times, and that the anal sex incidents occurred about two times. The victim's mother agreed to wear a body wire and confront the appellant while Detective Zoccola and another officer listened and recorded the conversation. The victim's mother confronted the appellant on September 16, 2004. Less than an hour after her conversation with the appellant ended, the police officers followed the appellant to work at the Game Keep. They confronted him in the store and asked to speak with him. The appellant waived his rights, and Detective Zoccola interviewed him and recorded the conversation. Afterward, the appellant took the police to his apartment where they recovered condoms, lubricant, a pornographic movie, and thirteen Polaroid photographs of the victim.

Detective Zoccola testified that during the appellant's interview, the appellant never denied any "behaviors." The appellant was formally arrested after the interview but was unable to post bond until January 2006. In February 2006, the appellant missed several court appearances, including his trial date, and Detective Zoccola tried to find him. Various agencies such as the Federal Bureau of Investigation (FBI), the Tennessee Bureau of Investigation (TBI), and the United States Marshals Service became involved, and the appellant was featured for twenty to thirty seconds on the television show America's Most Wanted. In July 2006, the appellant was located and arrested in

Roane County. When the appellant was returned to the police headquarters in Nashville, the media was present and asked the appellant why he had fled. The appellant said, "Because they're going to crucify me and act like I'm a horrible, evil, nasty person, and, basically, my lawyer told me that I didn't have a chance in hell."

On cross-examination, Detective Zoccola said the appellant did not appear shocked when the police arrived at the Game Keep. The detective and Lieutenant Chris Blackwell interviewed the appellant in the back office of the store. The room was small and just large enough for them to sit around a small table. Although Detective Zoccola did not formally arrest the appellant prior to the interview, the appellant was technically under arrest because he was not free to leave.

The State played the audiotape of Detective Zoccola's interview with the appellant for the jury. During the interview, the appellant stated the following: The appellant met the victim when the victim was ten or eleven years old, and the victim was at least eleven years old when the sexual abuse began. The abuse started because the victim wanted to know if the victim was bisexual, and the appellant acknowledged that the abuse occurred when the victim was eleven or twelve. The appellant estimated that he masturbated the victim more than twenty times and that the victim masturbated the appellant five or six times. The appellant estimated he performed oral sex on the victim more times than he masturbated the victim, but the appellant was not sure. The appellant never anally penetrated the victim, but the victim anally penetrated the appellant less than ten times. When Detective Zoccola asked the appellant if he got sexual pleasure from his acts with the victim, the appellant said, "Not really." The appellant said that he thought the victim enjoyed the sexual acts and that the appellant initiated the activity "sometimes." He said, "Whatever [the victim] wanted to do, we did." He told Detective Zoccola that he and the victim "played around with the camera some" and that pictures of the victim and condoms were in his apartment. The appellant told the detective that he last had sexual contact with the victim when the victim started the seventh grade, a full year before the interview.

Twenty-four-year-old Christopher Hand testified that he began going to the Game Keep while he was in high school and that the victim also visited the store. In June 2003, Hand overheard the appellant make statements about the victim. Hand acknowledged that the appellant said the victim slept at his apartment and in his bed. The appellant also said he and the victim had rented a hotel room, that the victim had fallen asleep, and that the appellant had removed the victim's clothes. However, Hand acknowledged that the appellant never admitted engaging in sexual acts with the victim.

No witnesses testified for the defense. After the State's proof, the State elected the following offenses: Count one, child rape, the appellant performed oral sex on the victim in the bedroom of the appellant's apartment and showed the victim a pornographic movie before they engaged in the conduct; count two, child rape, the appellant performed oral sex on the victim in the appellant's bedroom; count three, child rape, the victim performed oral sex on the appellant in the appellant's bedroom; count four, child rape, the victim performed oral sex on the appellant in the appellant's bedroom; counts five, child rape, the victim anally penetrated the appellant in the appellant's

bedroom; count six, child rape, the victim anally penetrated the appellant in the appellant's bedroom; count seven, child rape, the appellant anally penetrated the victim in the appellant's bedroom; count eight, aggravated sexual battery, the appellant masturbated the victim in the appellant's car while driving the victim home; count nine, aggravated sexual battery, the appellant masturbated the victim in the appellant's bedroom and showed the victim a pornographic movie prior to engaging in the conduct; count ten, aggravated sexual battery, the appellant masturbated the victim in the appellant's bedroom before the victim changed into his pajamas; count eleven, aggravated sexual battery, the victim masturbated the appellant in the appellant's bedroom; count twelve, especially aggravated sexual exploitation of a minor, the appellant took nude photographs of the victim showing the victim lying on his back with his legs spread and exposing the victim's penis, anus, and scrotum; and count thirteen, especially aggravated sexual exploitation of a minor, the appellant took photographs of the victim wearing a red t-shirt with his legs arched over his head and exposing his anus and scrotum. The jury convicted the appellant of all thirteen counts and two counts of failure to appear.

On appeal, the appellant contends that the evidence is insufficient to support the convictions and that his effective sentence is excessive. The State argues that the appeal should be dismissed because the appellant filed an untimely motion for new trial which resulted in his notice of appeal being untimely filed. The State also argues that, in any event, the evidence is sufficient and that the trial court properly sentenced the appellant.

## II. Analysis

### A. Untimely Notice of Appeal

Regarding that the State's contention that this court should dismiss the appellant's appeal because his notice of appeal was untimely filed, a motion for new trial must be made in writing or reduced to writing within thirty days of the "date the order of sentence is entered." Tenn. R. Crim. P. 33(b). This provision is mandatory, and the time for the filing cannot be extended. Tenn. R. Crim. P. 45(b); State v. Martin, 940 S.W.2d 567, 569 (Tenn. 1997). Because a trial court does not have jurisdiction to hear and determine the merits of an untimely motion for new trial, the trial court's "erroneous consideration [and] ruling on a motion for new trial not timely filed . . . does not validate the motion." Martin, 940 S.W.2d at 569 (citing State v. Dodson, 780 S.W.2d 778, 780 (Tenn. Crim. App. 1989)). An untimely motion for new trial "not only results in the appellant losing the right to have a hearing on the motion, but it also deprives the appellant of the opportunity to argue on appeal any issues that were or should have been presented in the motion for new trial." Id. Moreover, the untimely filing of a motion for new trial does not toll the time for filing a notice of appeal. Therefore, an untimely motion for new trial often will also result in an untimely notice of appeal. State v. Davis, 748 S.W.2d 206, 207 (Tenn. Crim. App. 1987).

The sentencing hearing in this case was held on July 11, 2007, and the judgments of conviction were entered that same day. The appellant filed his motion for new trial on August 30, 2007, arguing sufficiency of the evidence and excessive sentence. The trial court denied the motion in a written order filed on October 10, 2007. The appellant filed a notice of appeal on October 15,

2007. The appellant does not address the State's contention that his notice of appeal was untimely filed. The motion for new trial before us clearly was filed beyond the thirty-day time limit mandated by Tennessee Rule of Criminal Procedure 33(b). As a result, the appellant's notice of appeal also was untimely. However, the only issues the appellant raised in his new trial motion were sufficiency of the evidence and excessive sentence. See Tenn. R. App. P. 3(e) (providing that failure to raise an issue of error, other than sufficiency of the evidence or sentencing, in a motion for a new trial waives that issue for purposes of appellate review). Furthermore, "in all criminal cases the 'notice of appeal' document is not jurisdictional and the filing of such document may be waived in the interest of justice." Tenn. R. Crim. P. 4(a). In the interests of justice, we have decided to waive the timely filing of the notice of appeal in this case.

## B. Sufficiency of the Evidence

The appellant contends that the trial court erred by overruling his motion for judgment of acquittal as to counts one through seven and counts nine through eleven because the evidence is insufficient to support those convictions. Specifically, he contends that the victim repeatedly testified he was thirteen years old when most of the sexual activity occurred and that the only act proven to have occurred when the victim was younger than thirteen was the count eight aggravated sexual battery, that the appellant masturbated the victim in the appellant's car while driving the victim home. The appellant also contends that the State presented no proof to corroborate his inculpatory statement to Detective Zoccola. The State contends that the evidence is sufficient. We agree with the State.

"The standard by which the trial court determines a motion for judgment of acquittal at the end of all the proof is, in essence, the same standard which applies on appeal in determining the sufficiency of the evidence after a conviction." State v. Thompson, 88 S.W.3d 611, 614-15 (Tenn. Crim. App. 2000). When an appellant challenges the sufficiency of the convicting evidence, the standard for review is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); Tenn. R.App. P. 13(e). On appeal, the State is entitled to the strongest legitimate view of the evidence and all reasonable or legitimate inferences which may be drawn therefrom. State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). Questions concerning the credibility of witnesses and the weight and value to be afforded the evidence, as well as all factual issues raised by the evidence, are resolved by the jury as trier of fact. State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997). This court will not reweigh or reevaluate the evidence. Id. Because a jury conviction removes the presumption of innocence with which a defendant is initially cloaked at trial and replaces it on appeal with one of guilt, a convicted defendant has the burden of demonstrating to this court that the evidence is insufficient. State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

As charged in the indictments, rape of a child is the "unlawful sexual penetration of a victim by the defendant or the defendant by a victim if the victim is more than three (3) years of age but less than thirteen (13) years of age." Tenn. Code Ann. § 39-13-522(a). "Aggravated sexual battery is

-8-

unlawful sexual contact with a victim by the defendant or the defendant by a victim" when the "victim is less than thirteen (13) years of age." Tenn. Code Ann. § 39-13-504(a)(4). "'Sexual contact' includes the intentional touching of the victim's [or] the defendant's . . . intimate parts, . . . if that intentional touching can be reasonably construed as being for the purpose of sexual arousal or gratification." Tenn. Code Ann. § 39-13-501(6).

The appellant contends that the victim repeatedly testified he was thirteen years old when his sexual activity with the appellant occurred. We note that during the victim's testimony, he initially testified that he was "[t]hirteen, or -- yeah, thirteen -- twelve" when he first met the appellant. He also testified that he was thirteen years old when he began going to the appellant's apartment and that he was fourteen when he told his mother about the abuse. When the State asked the victim if he ever went to the appellant's apartment before he turned thirteen, the victim said, "Not that I can recall. . . . I am trying to think before he got his car. I am sorry. I am a little nervous."

However, the victim also testified unequivocally as follows: The victim and his mother moved from Kansas to Nashville in August 2001, when the victim was ten years old. While living in Nashville, the victim began going into the Game Keep and met the appellant. In August 2002, when the victim was eleven years old, he and his mother moved to Smyrna. A couple of months later, the appellant bought a car and began driving the victim to the Game Keep and the appellant's apartment. We note that the victim's mother's testimony corroborated the victim's time line. The victim also testified that shortly after the appellant bought a car, they had their first sexual encounter.

Taken in the light most favorable to the State, the evidence established that the abuse began shortly after the appellant bought a car in the fall of 2002. At that time, the victim was eleven years old. Detective Zoccola testified that he spoke with the victim and his mother in August 2004. At that time, the victim was thirteen years old. Therefore, although the victim testified that the abuse began when he was thirteen and that he told his mother and Detective Zoccola about the abuse when he was fourteen, the victim obviously was mistaken. Given that the abuse began shortly after the appellant bought his car and that the victim turned thirteen over a year later, the jury could conclude that the acts of sexual abuse alleged in the indictments occurred before the victim turned thirteen years old.

Regarding the appellant's claim that the evidence does not corroborate his confession, in Tennessee, it is well-established that a conviction cannot be founded solely upon a defendant's confession. State v. Smith, 24 S.W.3d 274, 281 (Tenn. 2000) (citing Ashby v. State, 139 S.W. 872, 875 (Tenn. 1911)). Some corroborating evidence is required which, independently of the confession, tends to establish the corpus delicti of the offense charged. Id. However, where there is a confession, the corroborative evidence "need not be as convincing as the evidence necessary to establish a corpus delicti in the absence of any confession." Ricketts v. State, 241 S.W.2d 604, 606 (Tenn. 1951). The corroborating evidence is sufficient to sustain a conviction if "it tends to connect the defendant with the commission of the offense, although the evidence is slight, and entitled, when standing by itself, to but little consideration." Id.; see also Smith, 24 S.W.3d at 281. "A confession may sustain a conviction where there is other evidence sufficient to show the commission of the

crime by someone." Taylor v. State, 479 S.W.2d 659, 661-62 (Tenn. Crim. App. 1972). In this case, the appellant's confession was not the only evidence connecting the appellant to the crimes because the victim testified in great detail about his acts with the appellant. In any event, the victim's statement to Detective Zoccola and the items recovered from the appellant's apartment sufficiently corroborate the appellant's inculpatory statement.

### C. Excessive Sentence

The appellant contends that the trial court erred by ordering him to serve the sentences for his child rape convictions consecutively because the trial court failed to find aggravating circumstances pursuant to Tennessee Code Annotated section 40-25-115(b)(5) to warrant consecutive sentencing. The State contends that the trial court properly ordered consecutive sentencing. We agree with the State

At the sentencing hearing, Robert Duncan testified that he had two sons. In 1992, Duncan and his sons attended at gaming conference at the Old Roadway Inn in Nashville. At that time, his oldest son was nine years old and his youngest son was six years old. Duncan noticed that the appellant was at the conference and that the appellant was "playing around" with his sons and buying them drinks and candy. Duncan asked the appellant to stop buying the boys snacks because he didn't want them "all buzzed up on sugar." However, the appellant continued to follow the boys, and Duncan asked him to stay away from them. Later, Duncan noticed he had not seen his sons for thirty to forty-five minutes. Someone at the registration desk said the appellant was seen walking with the boys toward the elevator. Duncan went up to his room, opened the door, and saw the appellant playing "horsey" with the nine-year-old. His son was sitting in the appellant's hands, and the appellant was swinging the boy back and forth. Duncan said that "I don't think I have to explain where his hands were." Duncan escorted the appellant out of the hotel and told him not to return. He did not report the incident to the police.

Detective Zoccola testified that in 1994, the appellant was charged in Loudon County with two counts of aggravated sexual battery after a ten-year-old girl and an eleven-year-old girl alleged that the appellant fondled their buttocks. The appellant was convicted of assault. Detective Zoccola also stated that during his interview with the appellant at the Game Keep, he asked the appellant if the appellant had molested other victims. The appellant mentioned two other boys who were ten, eleven, or twelve years old. The appellant said that he had fondled the first boy's penis at the store and that he had persuaded the second boy to pull down his pants. The appellant then looked at and commented on the size of the second boy's penis. The police contacted the boys' parents but did not interview the boys. Detective Zoccola said the appellant also may have been involved with the Big Brother organization. After the appellant fled to Roane County and was returned to Nashville, he told the media as follows:

> What happened with my friend was, you know, I wasn't trying to do
> anything bad, it wasn't like I tried to initiate something. It was, they

came to me and said, '[L]ets, I want to see what this is like.' And I
was just trying to do whatever it takes to make them happy.

Detective Zoccola stated that it was common for people sexually oriented toward children to obtain jobs where they were surrounded by children in order to win their trust and "groom" them. During Detective Zoccola's investigation of the appellant, he found prior notifications from people who "called in . . . suspicions like [the appellant] was hanging around ballparks, he was following little boys." On cross-examination, Detective Zoccola testified that the parents of the two boys the appellant mentioned during his interview questioned their sons about being molested but that the boys denied anything happened.

The appellant made a statement in his own behalf. He said he was physically abused by his stepfather as a child. When he was nine years old, a man driving a green car offered him a ride to school, took him to the man's house, and raped him several times. Afterward, the appellant was "constantly terrified." He stated he was afraid to be around people and had flashbacks. He was always afraid that adults were going to hurt him and, therefore, was only able to make friends with children. A doctor told the appellant that he probably suffered from avoidant personality disorder, and the appellant's job at the Game Keep was the first job that he held for more than one year. When the victim's mother told the appellant that the victim was going to kill himself, the appellant told her what she wanted to hear. He also told the police what they wanted to hear. The appellant fled because he was "overwhelmed by a lot of different things," and he asked the court to make a recommendation that he serve his sentence in special needs.

The State introduced the appellant's presentence report into evidence. According to the report, the then thirty-six-year-old appellant dropped out of high school after the tenth grade but obtained his General Equivalency Diploma (GED). In the report, the appellant stated that in 1985, he completed a six-week program at Parthenon Pavilion after he tried to commit suicide. The appellant also described his mental and physical health as poor, stating that he suffered from major depression, personality disorder, post-traumatic stress disorder, painful knees, back pain, headaches, seizures with occasional verbal ticks, and food allergies. The appellant reported that he had never used any non-prescribed drugs or alcohol and that he was honorably discharged from the United States Army. According to the report, the appellant worked at the Game Keep from 1999 until he was fired in 2004, and he was the manager of the store for at least part of that time. The report does not show that the appellant has a prior criminal history.

The trial court noted that it had considered the appellant's presentence report, the victim's impact statement, and the victim's mother's impact statement. The court found enhancement factors (1), that the appellant "has a previous history of criminal convictions or criminal behavior, in addition to those necessary to establish the appropriate range"; (7), that the "offense involved a victim and was committed to gratify the defendant's desire for pleasure or excitement"; and (14), that the appellant abused a position or private trust, applicable to the appellant's sentences. Tenn. Code Ann. § 40-35-114(1), (7), (14). The court found no mitigating factors applicable. The court noted that for the rape of a child convictions, Class A felonies, the appellant was facing punishments of

-11-

fifteen to twenty-five years and that for the aggravated sexual battery and especially aggravated sexual exploitation of a minor convictions, Class B felonies, the appellant was facing punishments of eight to twelve years. See Tenn. Code Ann § 40-35-112(a)(1), (2). For the failure to appear convictions, Class E felonies, the court noted that the appellant was facing sentences of one to two years. See Tenn. Code Ann § 40-35-112(a)(5). The court sentenced the appellant to eighteen years for each child rape conviction, nine years for each aggravated sexual battery conviction, nine years for each especially aggravated sexual exploitation of a minor conviction, and two years for each failure to appear conviction. Pursuant to Tennessee Code Annotated section 40-35-115(b)(5), the trial court ordered the appellant to serve the eighteen-year sentences consecutively. The court also ordered that two of the nine-year sentences be served concurrently to each other but consecutively to the child rape convictions and that the two failure to appear convictions be served concurrently to each other but consecutively to the other convictions for an effective sentence of one hundred thirty-seven years in confinement.

Appellate review of the length, range or manner of service of a sentence is de novo. See Tenn. Code Ann. § 40-35-401(d). In conducting its de novo review, this court considers the following factors: (1) the evidence, if any, received at the trial and the sentencing hearing; (2) the presentence report; (3) the principles of sentencing and arguments as to sentencing alternatives; (4) the nature and characteristics of the criminal conduct involved; (5) evidence and information offered by the parties on enhancement and mitigating factors; (6) any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee; and (7) any statement by the appellant in his own behalf; (8) the potential for rehabilitation or treatment. See Tenn. Code Ann. §§ 40-35-102, -103, -210 (2006); see also State v. Ashby, 823 S.W.2d 166, 168 (Tenn. 1991). The burden is on the appellant to demonstrate the impropriety of his sentence. See Tenn. Code Ann. § 40-35-401, Sentencing Commission Comments. Moreover, if the record reveals that the trial court adequately considered sentencing principles and all relevant facts and circumstances, this court will accord the trial court's determinations a presumption of correctness. Id. at (d); Ashby, 823 S.W.2d at 169.

"Whether sentences are to be served concurrently or consecutively is a matter addressed to the sound discretion of the trial court." State v. Adams, 973 S.W.2d 224, 230-31 (Tenn. Crim. App. 1997). In this case, the trial court imposed consecutive sentencing pursuant to Tennessee Code Annotated section 40-35-115(b)(5), which provides as follows:

> The defendant is convicted of two (2) or more statutory offenses involving sexual abuse of a minor with consideration of the aggravating circumstances arising from the relationship between the defendant and victim or victims, the time span of defendant's undetected sexual activity, the nature and scope of the sexual acts and the extent of the residual, physical and mental damage to the victim or victims[.]

The court made no findings as to the aggravating factors that warranted consecutive sentencing. However, based upon the record before us, we conclude that aggravating factors exist to justify consecutive sentencing.

The appellant served as a father figure to the victim, and the victim's mother testified that the victim "absolutely adored" the appellant. Furthermore, the time span of the appellant's undetected sexual activity was relatively long, beginning in the fall of 2002 and lasting for months and, possibly, more than one year. The scope of the sexual acts was great, progressing from masturbation, to oral sex, to anal sex. As the appellant stated to the victim's mother, "I think we did pretty much everything." Although the victim and his mother did not testify at the sentencing hearing about the extent of the residual, physical, and mental damage to the victim, they described some of the damage in victim impact statements submitted to the court. The victim's mother stated that the appellant's acts placed an "enormous and unimaginable emotional distress" on the victim and caused him to have nightmares. She explained, "How can I quantify the amount of time and level of pain, the exhaustive and seemingly endless nights holding my child as he cries himself to sleep?" In the victim's impact statement, he said he was afraid of men, game stores and people that visited them, and blue Pontiacs. He stated that he was afraid to be alone, that he was afraid people would find out he was raped, that he was afraid to go to sleep, and that he was afraid to trust people. He also said he was "paralyzed with fear." After considering the foregoing, we conclude that the trial court did not abuse its discretion in imposing consecutive sentencing.

### III. Conclusion

Upon review, we affirm the judgments of the trial court.

_____
NORMA McGEE OGLE, JUDGE