# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### Assigned on Briefs at Knoxville December 21, 2010

## STATE OF TENNESSEE v. CHARLES E. LOWE-KELLEY

**Appeal from the Circuit Court for Maury County**
**No. 17948      Stella Hargrove, Judge**

---

**No. M2010-00500-CCA-R3-CD - Filed February 14, 2011**

---

A Maury County Circuit Court jury convicted the defendant, Charles E. Lowe-Kelley, of two counts of first degree premeditated murder, two counts of first degree felony murder, and nine counts of attempted first degree murder. At sentencing, the trial court imposed consecutive sentences of life with the possibility of parole for each first degree premeditated murder conviction, merged the first degree felony murder convictions into the first degree premeditated murder convictions, and imposed concurrent sentences of 15 years' incarceration for each attempted first degree murder conviction to be served concurrently with the life sentences. On appeal, in addition to contesting the sufficiency of the evidence, the defendant contends that the trial court erred by (1) denying his motion for a continuance, (2) allowing a juror to remain on the jury who expressed an opinion about the case, (3) admitting evidence without establishing a proper chain of custody, (4) admitting a tape-recorded conversation between the defendant and a separately-tried co-defendant, and (5) imposing consecutive sentences. Because the defendant failed to file a timely motion for new trial, all issues except the sufficiency of the evidence and sentencing are waived. Furthermore, the untimely motion for new trial rendered the notice of appeal untimely. In the interest of justice, however, we waive the timely filing of the notice of appeal and review the remaining issues. Following our review, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3; Judgments of the Circuit Court Affirmed**

JAMES CURWOOD WITT, JR., J., delivered the opinion of the Court, in which JOSEPH M. TIPTON, P.J., and D. KELLY THOMAS, JR., J., joined.

Mark K. Green (at trial); and Robert C. Richardson, Jr. (at motion for new trial and on appeal), Columbia, Tennessee, for the appellant, Charles E. Lowe-Kelley.

Robert E. Cooper, Jr., Attorney General and Reporter; Benjamin A. Ball, Assistant Attorney General; T. Michel Bottoms, District Attorney General; and Kimberly L. Cooper, Assistant

District Attorney General, for the appellee, State of Tennessee.

**OPINION**

On April 13, 2008, the 16-year-old defendant, 20-year-old Robert Guerrero, 19-year-old Erick Guerrero, and 22-year-old Javoris Sparkman, shot at another vehicle containing 11 passengers while traveling on a Columbia highway. Two of the passengers, Patricia Garcia and Juan Castro, received fatal injuries, giving rise to the defendant's charges of two counts of first degree premeditated murder and two counts of first degree felony murder. Of the remaining nine passengers, two received injuries requiring hospitalization and seven others received no injuries. The defendant was charged with nine counts of attempted first degree premeditated murder related to these victims. Following his arrest as a juvenile, the defendant's case was transferred to circuit court, where it proceeded via indictment to trial.[1]

The evidence showed that on April 12, 2008, the defendant, his three separately-tried co-defendants, and the 11 victims attended a Quinceanera Party[2] at the National Guard Armory in Columbia, Tennessee. One of the victims, Jose Castro, testified that the crowded party was "like a riot in there. Everybody was fighting." Columbia Police Department officers responded to reports of the fights at the Armory sometime after midnight that night. Some officers arrived early enough to "break up" the party and order the attendees to leave. Others arrived as most of the people were leaving the parking lot. Several of the officers recorded the scene in the parking lot on the dashboard cameras of their cruisers; at least one of these videos showed the defendant leaving the parking lot with Robert Guerrero. Officer Jeremy Haywood recalled seeing Javoris Sparkman leaving the parking lot in a gold Pontiac.

Officer Tracy Duke arrived at the Armory to see a Hispanic male, later identified as Robert Guerrero, leaving the parking lot in a gold Pontiac Grand Prix. He

---

[1] William C. Barnes, Jr., was initially appointed to represent the defendant throughout his juvenile proceedings and transfer to circuit court. The trial court allowed Mark K. Green to substitute as retained counsel on January 21, 2009, approximately seven weeks before the March 16, 2009 trial date. On March 16, 2009, the trial court appointed Mr. Green to represent the defendant based upon its prior indigency determination. Mr. Green represented the defendant throughout trial and sentencing. Mr. Green, however, withdrew from representation prior to the motion for new trial hearing because he had accepted employment with the District Attorney's Office. The trial court appointed Robert C. Richardson, Jr., to represent the defendant for the motion for new trial and on appeal.

[2] A Quinceanera Party is a tradition in the Hispanic community to celebrate a girl's reaching the age of adulthood on her 15th birthday.

recalled that Mr. Guerrerro was "clutching his pants" as if he were carrying a weapon. Officer Duke saw three other individuals in the car as it left the parking lot. Within minutes, Officer Duke responded to a report of an accident on Nashville Highway and arrived to discover the gold Grand Prix in a ditch. Robert Guerrero and his cousin, Erick Guerrero, were standing outside the vehicle and told officers that they had been run off the road. When officers discovered an SKS automatic rifle near the car, the two men were arrested. Neither the defendant nor Mr. Sparkman was found at the scene.

Officers Jeremy Humphrey, Brad Ribley, Scott Alexander McPherson, and Jeremy Haywood testified consistently with Officer Duke's account of the events leading to the Guerreros' arrest. Each of the officers assisted in collecting evidence at the scene which was later sent to the Tennessee Bureau of Investigation (TBI) Crime Lab for analysis. Officer Haywood arrested the defendant on April 14, 2008. At his arrest, the defendant had newspaper clippings concerning the shooting and the Guerreros' arrest in his pants pocket.

Columbia Police Department Detective Jeremy Alsup was the lead detective on the investigation of the shooting. Upon learning that some shooting victims appeared at Williamson County Medical Center within a short time of the Guerreros' accident report, Detective Alsup went to the medical center to find several of the victims and their Ford Expedition still there. Jose Castro and Sarah Garcia, the two surviving victims who suffered injuries, had been transported to Vanderbilt University Medical Center by the time Detective Alsup arrived. Detective Alsup also testified regarding the transcription of a tape recording between the defendant and Erick Guerrero that was made while Erick Guerrero was incarcerated at the county jail.[3]

Columbia Police Department Officer Korey Cooper examined the victims' Ford Expedition. The vehicle was damaged by gunshots to the driver's side, many of which exited on the passenger's side. A .38 caliber bullet was found in the headliner of the Expedition. The windows were shattered and held together by tinting in some places. Officer Cooper determined that between nine and 10 rounds of ammunition were fired into the vehicle.

Several experts from the TBI Crime Lab testified regarding their findings.

---

[3] The transcript of the jail tape recording was utilized as an aid to the jury while they listened to the recording of the conversation at trial. The trial court correctly instructed the jury that the transcript was not evidence. Likewise, the transcript was admitted for identification purposes only. On appeal, the defendant alleges that the tape recording should have been excluded, citing *Bruton v. United States*, 391 U.S. 123 (1968). Although the defendant properly preserved this issue at trial, the defendant failed to include the tape recording in the record on appeal.

Special Agent Steve Scott, a ballistics expert, determined that a bullet recovered from Sarah Garcia's leg was fired from the SKS assault rifle found near the Guerreros' vehicle. He also determined that both Juan Castro and Patricia Garcia's fatal injuries were the results of bullets fired from the same .38 caliber weapon. The .38 caliber handgun, however, was never recovered. Special Agent James Russell Davis, II, analyzed gunshot residue swabs taken from the Guerrero cousins. The test results were inconclusive concerning Robert Guerrero and negative for the presence of gunshot residue for Erick Guerrero. Special Agent Miranda Teary performed microanalysis on paint chips found at the accident scene and determined that the samples matched the paint on both the gold Pontiac and the Ford Expedition. Special Agent Mark Dunlap performed DNA analysis on a green bandana and the SKS rifle found at the scene. The bandana contained DNA from both Erick Guerrero and the defendant. The SKS rifle contained DNA from Robert Guerrero and Mr. Sparkman but did not have any DNA from either Erick Guerrero or the defendant.

The defendant telephoned Tiffany Fuller, Robert Guerrero's girlfriend, at approximately 2:00 a.m. on April 13. He told Ms. Fuller that there had been "an accident" and that Robert and Erick Guerrero were still at the scene. He told Ms. Fuller that he ran from the scene. Ms. Fuller said that the defendant told her about the shooting but that he assured her that neither Robert nor Erick had fired a weapon. The defendant, however, never admitted to her that either himself or Mr. Sparkman was a shooter.

The defendant spoke to Paul Bernie Swafford on April 14, 2008, and admitted to Mr. Swafford that he had been involved in the shooting "the night before out by the Coca Cola Plant." Mr. Swafford recalled that the defendant told him that "they had shot up a truck" and that the defendant had "an SKS and a .38." He said that the defendant described the shooting as "[a] cold hit." Mr. Swafford contacted the police and anonymously reported what he had learned.

Jason Fletcher drove the defendant to the Armory at approximately 11:00 p.m. on April 12, 2008. Mr. Fletcher went home and saw the defendant again the next day at approximately 1:00 p.m. when the defendant showed up on his front porch steps. The defendant told Mr. Fletcher that he needed to talk to him. Mr. Fletcher recalled that the defendant was wearing shorts and that his legs were "scarred . . . like he'd been running through thorns." The defendant told Mr. Fletcher that "a fight broke out" at the Armory and that Robert Guerrero had handed him a gun and "told him to be ready." The defendant told Mr. Fletcher that they pulled up beside the victims' vehicle and started shooting. The defendant told Mr. Fletcher that Mr. Sparkman had the SKS rifle, that he had a .38 handgun, and that he "emptied the clip." Mr. Fletcher told the defendant to leave his house. Although he did not contact the police, he did give a statement to the police once they contacted him.

Sarah Garcia, one of the attempted first degree murder victims, had never met any of the defendants prior to the night of April 12. She remembered Mr. Sparkman from the party because he wore distinctive clothing that included bright orange shoes.[4] After her boyfriend, Jose Castro, got into a fight, she and the other victims decided to go home. Jose Castro drove the Expedition while she rode in the front passenger seat. Carlos Landauro, Patricia Garcia, Jonathan Trugas, and Jose Valadiz rode in the middle row seat. Jason Castro, Leonicio Santas, Juan Castro, Jonathan Zaragoza, and Dalilia Cortinas rode in the cargo area with the third row seat folded down.

Jose Castro noticed someone following their vehicle and warned everyone to "sit down and sit still." Soon thereafter, a vehicle struck the Expedition and Sarah Garcia "saw . . . fire" coming from the other vehicle. Jose Castro threw Sarah Garcia down in the seat. She called for her sister, Patricia Garcia. When Patricia Garcia did not answer, Sarah Garcia looked in the back seat and saw that Patricia Garcia "was gone." Sarah Garcia realized that she and Jose Castro had also been hit by the gunfire. She recalled hearing Jose Castro's younger brother, Juan Castro, yell from the back of the Expedition that he had also been hit. Sarah Garcia never saw any of the occupants of the other vehicle. Jose Castro drove directly to Williamson County Medical Center. Sarah Garcia and Jose Castro were transported to Vanderbilt University Medical Center for further treatment.

Jose Castro recalled being followed by a vehicle while on his way to Franklin after leaving the party at the Armory. He admitted that he had been involved in a brief fight at the party with someone other than the defendants. He said that he had, in fact, never met any of the defendants. As Robert Guerrero's Pontiac approached the driver's side of the Expedition, the driver turned off the headlights. Suddenly, sparks were flying from the car, and Jose Castro realized that they were being hit by gunfire. He rammed the Pontiac off the road and rushed to Williamson County Medical Center. He knew that Sarah Garcia, Patricia Garcia, Juan Castro, and he had been hit. He recalled that his youngest brother, Jason Castro, yelled for him to hurry because Juan Castro had been hit.

Carlos Landauro sat behind Jose Castro in the second row seat of the Expedition. He remembered seeing sparks flying from the approaching car. He said that everyone in the Expedition "ducked down." He was seated next to Patricia Garcia and recalled her being struck by gunfire. He could not see the occupants in the other car.

Jason Castro was ten years old on April 13, 2008. He recalled he left the party at the Armory with his family when all the fighting began. Jason Castro remembered seeing a car following them. He saw sparks fly from the car. He saw his brother, Juan Castro, get

---

[4] A single bright orange shoe was recovered at the scene near the gold Pontiac.

shot next to him in the back of the Expedition. He yelled for his brother, Jose Castro, to hurry to the hospital.

Doctor Amy McMasters, a forensic pathologist, determined that Patricia Garcia died from a single gunshot wound to her head. Doctor McMasters recovered a bullet from Patricia Garcia's brain that was analyzed by the TBI Crime Lab and determined to be one fired from a .38 caliber handgun. She also determined that Juan Castro suffered three bullet wounds to his torso. Two bullets were recovered from Juan Castro's chest and right shoulder. A third wound exited Juan Castro's chest, causing fatal damage to his heart and lungs. The bullets recovered from Juan Castro were also determined to have been fired from a .38 caliber handgun.

Based upon this evidence, the jury convicted the defendant of the first degree premeditated murder of Juan Castro, the first degree murder of Juan Castro committed in the perpetration of an attempted first degree murder, the first degree premeditated murder of Patricia Garcia, the first degree murder of Patricia Garcia committed in the perpetration of an attempted first degree murder, and nine counts of attempted first degree murder of the surviving victims. At the May 11, 2009 sentencing hearing, the trial court merged each felony murder conviction into the appropriate premeditated first degree murder conviction and imposed two life sentences with the possibility of parole to be served consecutively to one another based upon its finding that the defendant qualified as a dangerous offender. *See* T.C.A. § 40-35-115(4). The trial court imposed concurrent sentences of 15 years' incarceration for each attempted first degree murder conviction[5] and ordered the effective 15-year sentence to be served concurrently with the life sentences. The record reflects that the trial court correctly considered and applied the principles of sentencing in arriving at its overall sentencing decision.

On May 29, 2009, the defendant filed a "Motion for New Trial." The motion simply stated that the defendant "files this Motion for New Trial in accordance with the Rule 33 of the Tennessee Rules of Criminal Procedure and accordingly seeks this Honorable Court to grant his motion and grant him a new trial." The motion stated absolutely no grounds upon which to seek the requested relief. The motion did, however, state that it was "filed concurrently with a Motion to Withdraw" by counsel. The technical record is devoid of any motion to withdraw, but it is apparent from comments made by the trial court at subsequent hearings that trial counsel withdrew from further representation because he had accepted

---

[5] On appeal the defendant argues that the trial court misapplied certain enhancement factors in determining the length of the attempted first degree murder sentences. The trial court discussed certain factors but ultimately, however, imposed the minimum 15 year sentence for each attempted first degree murder conviction.

employment with the District Attorney General's Office at some point during his representation of the defendant. The purported "Motion for New Trial" further sought "liberal time" to amend.

On July 16, 2009, the trial court appointed current counsel to represent the defendant at the motion for new trial hearing and on appeal. A motion stating specific grounds for a new trial was filed by counsel on January 20, 2010. The trial court heard argument and overruled the motion for new trial on March 1, 2010. The defendant filed a notice of appeal on the same day. Unfortunately, as we will explain, all of these actions by subsequent counsel and the trial court were ineffectual.

Tennessee Rule of Criminal Procedure 33(b) provides that a motion for new trial must be filed "within thirty days of the date the order of sentences is entered." Although the rule also provides that the trial court should allow liberal amendments to a motion for new trial, attorneys are warned against "mak[ing] a regular practice of filing only a skeletal motion with the intention of bringing all of their substantive grounds" at a later time. *See* Tenn. R. Crim. P. 33, Advisory Commission Comments. "Before a ground in a motion for a new trial can be relied upon, the ground must be specified with reasonable certainty." *State v. Blunkall*, 731 S.W.2d 72, 74 (Tenn. Crim. App. 1987) (citing *State v. King*, 622 S.W.2d 77 (Tenn. Crim. App. 1981)). Indeed, as Tennessee Rule of Criminal Procedure 47 provides "[a] motion shall state . . . with particularity the grounds on which it is made. . . ." Tenn. R. Crim. P. 47(c)(1).

The putative motion filed in this case contained absolutely no grounds and sought only leave to amend the motion at a later date. As we held in *Blunkall*, "[i]t is not sufficient that the defendant file 'some document' . . . he must file a motion for a new trial specifying grounds for relief." *Id.* Thus, the May 29 motion was completely ineffectual in preserving the defendant's right to appeal issues that may have resulted in a new trial. *See* Tenn. R. App. P. 3(e).

Consequently, the purported amended motion filed on January 20, 2010, was untimely and was, therefore, a nullity. Rule 45(b)(3) specifically forbids the trial court from "extend[ing] the time for taking any action under the Rules of Criminal Procedure 29, 33 and 34." *See State v. Martin*, 940 S.W.2d 567, 569 (Tenn. Crim. App. 1997). The trial court's consideration of the issues raised in the January 20 motion was also of no effect. "Subsequent review or considerations by the trial court or agreements of parties to hear a late-filed motion will not validate the motion for purposes of appellate review." *State v. Heather Massengill*, E2006-02602-CCA-R3-CD, slip op. at 1 (Tenn. Crim. App., at Knoxville, May 12, 2008) (citing *State v. Dodson*, 780 S.W.2d 778 (Tenn. Crim. App. 1989); *State v. Davis*, 748 S.W.2d 206 (Tenn. Crim. App. 1987)).

Because the motion for new trial was untimely, any issues raised on appeal that would result in a new trial are waived. Tenn. R. App. P. 3(e); *Dodson*, 780 S.W.2d at 780. Any issues that would result in a dismissal, however, may still be reviewed by this court. Tenn. R. App. P. 3(e); *State v. Williams*, 675 S.W.2d 499, 501 (Tenn. Crim. App. 1984). Accordingly, we conclude that all of the defendant's issues are waived, save his challenges to the sufficiency of the evidence and sentencing.

We further note that Tennessee Rule of Appellate Procedure 4 requires the filing of a notice of appeal within thirty days of the entry of judgment or denial of a motion for new trial. Because the defendant's motion for new trial, subsequent amendment, and the trial court's order in this case were ineffectual, the notice of appeal was also untimely. *See, e.g.*, *State v. Patterson*, 966 S.W.2d 435, 440 (Tenn. Crim. App. 1997). Rule 4(a) provides that this court may waive the requirement of a timely filed notice of appeal when "such a waiver is in the interest of justice."

In consideration of the severity of the convicted offenses, we waive the timely filing of the notice of appeal in this case. Accordingly, we will review the sufficiency of the evidence presented to support the defendant's convictions as well as the propriety of the trial court's sentencing determination.

We review the defendant's claim attacking the sufficiency of the evidence to support his convictions mindful that our standard of review is whether, after considering the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Tenn. R. App. P. 13(e); *Jackson v. Virginia,* 443 U.S. 307, 324, 99 S. Ct. 2781, 61 L. Ed.2d 560 (1979); *State v. Winters,* 137 S.W.3d 641, 654 (Tenn. Crim. App. 2003). This standard applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of direct and circumstantial evidence. *Winters,* 137 S.W.3d at 654.

When examining the sufficiency of the evidence, this court should neither re-weigh the evidence nor substitute its inferences for those drawn by the trier of fact. *Winters,* 137 S.W.3d at 655. Questions concerning the credibility of the witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact. *State v. Cabbage,* 571 S.W.2d 832, 835 (Tenn. 1978). Significantly, this court must afford the State the strongest legitimate view of the evidence contained in the record as well as all reasonable and legitimate inferences which may be drawn from the evidence. *Id.*

The defendant contends that the evidence presented failed to show his involvement in the convicted offenses. The defendant admitted his involvement in the

offenses to three different people, eye witnesses placed the defendant with the other passengers of the Pontiac, and forensic analysis placed the defendant in the vehicle. Accordingly, we conclude that the evidence is sufficient to support the defendant's convictions.

Turning to the defendant's allegation concerning the trial court's imposition of consecutive sentences, we note that when a defendant is convicted of multiple crimes, the trial court, in its discretion, may order the sentences to run consecutively if it finds by a preponderance of the evidence that a defendant falls into one of seven categories listed in Tennessee Code Annotated section 40-35-115. They are:

> (1) The defendant is a professional criminal who has knowingly devoted such defendant's life to criminal acts as a major source of livelihood; (2) The defendant is an offender whose record of criminal activity is extensive; (3) The defendant is a dangerous mentally abnormal person so declared by a competent psychiatrist who concludes as a result of an investigation prior to sentencing that the defendant's criminal conduct has been characterized by a pattern of repetitive or compulsive behavior with heedless indifference to consequences; (4) The defendant is a dangerous offender whose behavior indicates little or no regard for human life, and no hesitation about committing a crime in which the risk to human life is high; (5) The defendant is convicted of two (2) or more statutory offenses involving sexual abuse of a minor with consideration of the aggravating circumstances arising from the relationship between the defendant and victim or victims, the time span of defendant's undetected sexual activity, the nature and scope of the sexual acts and the extent of the residual, physical and mental damage to the victim or victims; (6) The defendant is sentenced for an offense committed while on probation; or (7) The defendant is sentenced for criminal contempt.

T.C.A. § 40-35-115(b) (2006). The existence of a single category is sufficient to warrant the imposition of consecutive sentences, *see State v. Adams*, 973 S.W.2d 224, 231 (Tenn. Crim. App. 1997), and indeed, "[e]xtensive criminal history alone will support consecutive sentencing," *id*. In *State v. Wilkerson*, 905 S.W.2d 933 (Tenn.1995), the supreme court imposed two additional requirements for consecutive sentencing when the "dangerous offender" category is used; the court must find consecutive sentences are reasonably related to the severity of the offenses committed and are necessary to protect the public from further

criminal conduct. *Id*. at 937-39; *see State v. Imfeld*, 70 S.W.3d 698, 707-08 (Tenn. 2002).

At the May 11, 2009 sentencing hearing, the trial court noted that the defendant, who was age 17 at sentencing, possessed a juvenile history spanning ten years. The defendant was first adjudicated unruly at age 8 and later, between the ages of 13 and 15, amassed over ten adjudications in juvenile court. The trial court correctly noted that three of the these juvenile adjudications would have been felonies if committed by an adult: two aggravated burglaries and one theft of property valued at over $1,000. The defendant admitted substantial illegal drug use ranging from his daily use of marijuana since age 13 to trying cocaine "a couple of times." The defendant was also on juvenile probationary release status at the time the present offenses were committed. Consequently, the trial court concluded that the defendant is "an offender whose record of criminal activity is extensive." T.C.A. § 40-35-115(b)(2).

In addition to finding that the defendant's extensive criminal history warranted the imposition of consecutive sentences, the trial court concluded that defendant is "a dangerous offender whose behavior evidences little or no regard for human life and [who has] no hesitation about committing a crime when the risk to human life is high," T.C.A. § 40-35-115(b)(4), commenting that "it's amazing more people were not injured or killed, because the windows were blown out [of the victims' vehicle], and the bullets were going into that vehicle with no regard for who was being hit." The trial court also found that consecutive sentences are necessary to protect the public from the defendant's future conduct and are reasonably related to the severity of the offenses. *See Wilkerson*, 905 S.W.2d at 937-39.

The defendant contends that the trial court should not have considered his juvenile history contained in the presentence report because, he claims, the presentence report does not contain certified copies of the adjudications and are, therefore, unreliable hearsay. Initially, we note that trial counsel conceded the validity of the defendant's juvenile history at the sentencing hearing. Additionally, we conclude that certified copies of the adjudications were not requisite to the trial court's consideration of the defendant's juvenile history and that the juvenile history contained in the presentence report may serve as the basis, in part or in whole, for a trial court's consecutive sentencing imposition pursuant to the extensive criminal history factor. *See State v. Adams*, 45 S.W.3d 46, 59 (Tenn. Crim. App. 2000) (trial court properly relied upon evidence of juvenile history contained in presentence report to impose consecutive sentences).

The defendant also makes the general argument that "one life sentence would seem to address the needs of society, the Courts and the [Defendant] more effectively and efficiently" than the two consecutive life sentences imposed by the trial court. It is our view,

however, that the record supports the trial court's imposition of consecutive sentences. The defendant was 16 years old at the time of the crimes and had garnered 10 prior juvenile adjudications, three of which would have been classified as felonies if committed by an adult. His criminal history began at age 13, and his first unruly adjudication occurred at age 8. As noted by the trial court, the presentence report reflects that the defendant "has fought the [juvenile justice] system on any efforts of rehabilitation." Further, the circumstances of the crimes indicate the defendant's willingness to commit a crime when the risk to human life was high. The crimes in this case were severe and, in our view, warranted the imposition of consecutive sentences.

The defendant failed to file a timely motion for new trial, thereby waiving any allegations of error that may have resulted in a new trial and rendering the notice of appeal untimely as well. In the interest of justice, however, we waive the timely filing of the notice of appeal in order to address the defendant's remaining issues concerning the sufficiency of the evidence and consecutive sentencing. We conclude that the evidence is sufficient to support the defendant's convictions and that the trial court did not abuse its discretion by imposing consecutive life sentences for these crimes. Accordingly, the judgments of the trial court are affirmed.

_____
JAMES CURWOOD WITT, JR., JUDGE