# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### Assigned on Briefs March 21, 2012

## STATE OF TENNESSEE v. OWEN PRESLEY

### Appeal from the Circuit Court for Marshall County
### No. 2010-CR-83    Robert Crigler, Judge

---

### No. M2011-00339-CCA-R3-CD - Filed Spetember 24, 2012

---

A Marshall County jury convicted appellant, Owen Presley, of two counts of aggravated kidnapping and six counts of rape. The trial court merged the two counts of aggravated kidnapping into one count and the six counts of rape into one count and ordered the appellant to serve concurrent sentences of twelve years in the Tennessee Department of Correction. On appeal, appellant argues that the evidence was insufficient to convict him and that the trial court should have merged his conviction for aggravated kidnapping with his rape conviction. After reviewing the record, we conclude that appellant untimely filed his notice of appeal and that the interest of justice does not require this court to waive the timely filing requirement. Accordingly, we dismiss the appeal.

### Tenn. R. App. P. 3 Appeal as of Right; Appeal Dismissed

ROGER A. PAGE, J., delivered the opinion of the Court, in which NORMA MCGEE OGLE and ROBERT W. WEDEMEYER, JJ., joined.

Clifford K. McGown, Jr., Waverly, Tennessee (on appeal); Donna Hargrove, District Public Defender, and William J. Harold, Assistant District Public Defender, Lewisburg, Tennessee (at trial) for the appellant, Owen Presley.

Robert E. Cooper, Jr., Attorney General and Reporter; Clark B. Thornton, Assistant Attorney General; Charles Frank Crawford, Jr., District Attorney General; and Weakley E. Barnard, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

## I. Facts and Procedural History

A Marshall County grand jury indicted appellant on two counts of aggravated kidnapping and six counts of rape. The Marshall County Circuit Court held a jury trial on October 28, 2010, at which the parties presented the following evidence:

The victim[1] testified that on March 5, 2010, she was living in a house with her youngest daughter Christina and Christina's son. Appellant was her next door neighbor. On the night of March 5th, appellant knocked on the victim's front door. Christina answered the door and called the victim to the door. The victim said appellant had a lot of blood on his forehead and hand. Appellant told the victim that he could not unlock his door and asked her if he could use her telephone. The victim allowed appellant to use her telephone; however, appellant could not remember the telephone number of whom he was calling. Appellant asked the victim to go with him next door and unlock his door for him. The victim walked with appellant to his house, appellant handed her the key, and she unlocked the door.

The victim said appellant was behind her when she unlocked the door and pushed her inside his house. Appellant entered his house after he pushed the victim inside. Appellant went into the kitchen and tried to clean the blood off of his head. The victim tried to leave, but appellant told her that he still needed help. Appellant pulled the victim by her pants into his bedroom. He pushed the victim onto the bed. Appellant put his mouth on the victim's vagina and touched her vagina with his tongue. Appellant also put his penis inside the victim's mouth and inside her vagina. Appellant used his body to hold her down. The victim had arthritis and a bulging disk in her back. She said appellant caused her back pain to worsen during the rape, and her back pain increased after the rape. She also said that appellant's penis hurt her vagina during the attack.

The victim could not remember whether appellant said anything during the incident. She stated that she wanted to leave but that he would not allow her to do so. She said the bedroom had one door and a window, which appellant had covered with cardboard. Appellant stopped attacking the victim when Alex, the boyfriend of the victim's oldest daughter Jessica, knocked on his door. Appellant answered the door. Alex asked for the victim, and appellant told him that she was not at his house. The victim said that she thought

---

[1] It this court's policy to omit the names of victims of sexual offenses. Furthermore, we will refer to the victim's children by their first name only in order to protect the victim's privacy. By doing so, we intend no disrespect.

that the situation would have been worse if she had tried to leave when appellant went to answer the door. Ten to fifteen minutes after Alex left appellant allowed the victim leave using the back door.

When the victim exited appellant's home, she saw Jessica and Alex walking toward appellant's home. They asked the victim where she had been and what had happened. The victim did not tell them what happened because she was afraid. They went to the victim's home, and the victim took a bath. The victim had appellant's blood on her clothes, stomach, arms, and back after the attack. She put the clothes that she had been wearing against the bathroom wall. After she bathed herself, the victim went to talk to her daughters and Alex.

The victim said that appellant told her that "whenever he want[ed] more of [her], he would come get it any time he wants." The victim testified he said it "[f]riendly like, but it was still scary." She further testified she was upset and afraid that appellant would attack her again. The victim stayed at Jessica's house after the attack because she felt safer there.

The next day the victim talked to her family about what appellant had done to her. The victim's son Richard had come to Jessica's house because he was concerned about the victim. Richard talked to the victim about what happened and wanted her to go to the police. The victim said she was afraid to go to the police but eventually went with Richard. Richard brought the clothes that the victim was wearing when appellant attacked her to the police station. The victim told the police what happened. The police officers showed her a photograph lineup, and she identified appellant as the man who had raped her. The victim was afraid of seeing appellant again and no longer wanted to live next to him after the rape. She said that talking about the rape was stressful and still bothered her.

On cross-examination, the victim testified that appellant pushed her "[a] little" hard inside his home. Appellant pulled her hard when she was trying to leave the kitchen. She said she was afraid of appellant so she did what he wanted. However, the victim also said that appellant had not hurt her or done anything to make her afraid. She further said that when appellant began to rape her, she told him that she "had two kids at home [whom she] needed to go home to." She said appellant had a liquor bottle in his hand when he came to her home, and he was acting "a little drunk."

The victim could not remember if appellant rolled her from her back over to her stomach or if she rolled over voluntarily. She said that when appellant got up to answer the door, he closed the bedroom door behind him. He told her that he would be "right back" and to stay in his bedroom. The victim said she stood up and was going to leave, but she was afraid to do so. The victim heard Alex's voice when he knocked on appellant's door. She said he was not yelling and was talking normally. She said that he could have heard her if

she had yelled out to him, but she was afraid to yell. Before the day he raped her, the victim had never been inside appellant's house.

On redirect examination, the victim explained that before the rape, she had arthritis in her back and a bulging disk. She said that after appellant pushed her on the bed, her back hurt a little more than it previously did. The victim went to the hospital after she talked to the police. She could not remember whether the hospital checked her back. The hospital did a rape kit and took vaginal and oral samples.

Alex testified that the victim was his girlfriend's mother. On March 5, 2010, Christina, the victim's youngest daughter, called him and told him that she had not seen the victim in approximately one hour. Alex advised her to look for her mother next door at appellant's house or at her the home of her grandmother, victim's mother, which was next door on the other side. He instructed her to call him back if the victim was not at either of those places, and he would try to get a ride to the victim's home. Alex said that Christina called him again, and she was "hysterical, crying on the phone." Alex told her to call Jessica so that Jessica could drive Alex to the victim's home. He instructed Christina to stay in the house with her son until he and Jessica arrived.

Jessica arrived to pick up Alex about ten minutes after the telephone call. They went to the victim's home to look for her. Christina told them appellant had come over and asked to use the telephone, and the victim allowed him to use it. She further told them that appellant asked the victim to help him clean his wounds and that the victim went next door with appellant. Alex went to the appellant's home and knocked on the door. Appellant was shirtless when he answered the door. Alex asked appellant if the victim was at appellant's house, and appellant told him she was not. Alex told appellant that Christina told him that the victim was there. Appellant again denied that the victim was there.

Alex returned to the victim's home and told Jessica to go to her grandmother's house again to see if the victim was there. Jessica went to her grandmother's house and, upon her return, advised Alex that the victim was not there. Alex checked the victim's backyard but did not see the victim. Alex, Jessica, and Christina stood in the victim's front yard contemplating calling the police. After ten to fifteen minutes, Alex heard a door open in the back. He thought it could have been the victim so he told Jessica to check inside while he went to the back of the house. When he got to the back of the house, he saw the victim exiting appellant's back door. Alex said that the victim was trembling and seemed afraid. He described her as appearing "[l]ike she had seen a ghost[;] frightened." Alex asked the victim where she had been and what happened. The victim told him that she had gone to feed her dogs. Alex did not believe the victim because "she had this scared look on her face[.]"

-4-

Alex and the victim began walking toward the front yard. Jessica approached them and began questioning the victim. They went inside the house, and Jessica and Alex continued to question the victim about what she had been doing. Alex noticed blood on the front of the victim's shirt and on the victim's pants. When the victim reached for something, Alex also saw blood on her stomach. Alex said that he did not see the blood while they were outside because it was dark. The victim told him and Jessica that she had been helping appellant clean his wounds. Alex said that he was concerned because if she was cleaning his wounds, blood should not have gotten under her clothing.

Alex questioned the victim about the blood on her stomach. The victim told him that appellant had "grabbed her and was touching on her when she was cleaning the wound." Alex told Christina to take the victim into the bathroom, and Christina complied. Alex said that Christina looked scared and was crying when she returned from taking the victim to the bathroom. When the victim came out of the bathroom, Alex, Jessica, and Christina continued to ask her what happened. The victim eventually began crying and told them what happened. Alex told the victim that they needed to report what happened to the police. The victim initially was afraid to call the police and refused. He said that the victim was upset and agitated. The victim slurred her words, and she was afraid to say anything.

The victim was afraid to stay at her home and went to Alex and Jessica's home. While there, she told Alex and her daughters that appellant had threatened to hurt her and her family. The next morning the victim had calmed. Alex asked her if she was going to call the police, and she told him that she was unsure. Alex went to work and later received word that the victim had called the police.

Jessica testified that on March 5, 2010, Christina called her while she was at work. Christina told her that their mother, the victim, had been missing for approximately an hour. She said Christina sounded concerned. Jessica asked her boss for permission to leave early so she could find out what was happening. Jessica left work and picked up Alex. She and Alex went to her mother's house, and her mother was not there.

Jessica watched Alex walk over to appellant's house to see if the victim was there. She said that Alex knocked on the door "for a good couple of minutes," and nobody answered. Alex continued to knock and someone eventually answered. Jessica could only see Alex and a little light coming from the door. She could not see the person who opened the door or hear anything that Alex and the person said. When Alex returned from next door, he told Jessica and Christina that the person who opened the door told him that the victim was not there.

Jessica walked to her grandmother's house to see if the victim was there; she was not. Jessica looked for the victim around the victim's house. As they were searching between the victim's and appellant's homes, they saw the victim walking from behind appellant's home. Jessica said she could see a little of her mother because of the streetlights and that her mother looked "scared and shaken."

Jessica, Christina, Alex, and the victim went inside the victim's house. The victim's daughters and Alex asked the victim where she had been. The victim told them that she had gone to help appellant in his house. Jessica said the victim looked scared, and they asked her why she was so scared. Initially, the victim would not tell them anything; however, Jessica was concerned and continued to question the victim.

Jessica said the victim had blood on her clothes and stomach. They questioned the victim about the blood. Alex and Jessica told Christina to go into the bathroom with the victim. The victim took off the bloody clothes and washed herself. When the victim came out of the bathroom, her daughters and Alex continued to ask her how the blood got on her skin. The victim "finally broke down and told [them] what happened." Jessica asked the victim if she would feel safer at Jessica's house because the victim's back door would not lock. They all decided that the victim would stay at Jessica's house and went there for the night.

While at Jessica's home, Jessica, Christina, Alex, Richard, and the victim discussed what happened. The victim told them what appellant had said to her and why she initially would not tell them what happened. They tried to convince the victim to tell the police about what happened. According to Jessica, Alex "knew something was wrong[, s]o he was like, I think you should go to the cops, because even if nothing happened, maybe he needs help." Initially, the victim was hesitant about speaking to the police. She eventually went to the police station with Richard.

Richard testified Christina called him twice on March 5, 2010. He said she was worried because their mother was missing. Richard said the calls caused him to "get a little bit excited," and he went to check on his mother. While on the way, he received word that they had found his mother. Richard went to Jessica's house. He saw the victim and said she looked shaken and scared. The victim told Richard what happened. Richard testified that he had never seen his mother that upset or scared before. He said that the victim did not want to go to the police, but she allowed him to take her the next day.

Richard knew that the victim's bloody clothes would be important. He retrieved the clothes from Jessica's bathroom, put them in a grocery bag, and brought them to the police

station. Richard and the victim spoke with Detective Henley of the Lewisburg Police Department.

Christina testified that she and her son lived with the victim. On the night of the victim's rape, Christina was home with her son and the victim when someone knocked on the door. The victim opened the front door. Christina identified appellant as the person who had knocked on the door. The victim and appellant began talking, but Christina could not hear what they were saying. The victim handed appellant the telephone, and appellant dialed a number. Christina said appellant had a large bump on his forehead and blood on his head and hand.

After appellant used the telephone, he and the victim went to his house. Christina heard appellant say that he could not open his door. She saw appellant pull the victim inside his home. She said that appellant's pulling the victim frightened her, so she called Richard. She told Richard what was happening, and Richard told her to go to appellant's house and knock on the door. Christina knocked on appellant's door, but nobody answered. Christina returned home, called Richard again, and told him that nobody answered the door .

After calling Richard, Christina called Jessica and told her what happened. Next, she called Alex and told him what happened. After she got off the telephone with Alex, she waited for Jessica and Alex to arrive. Jessica and Alex found the victim when they arrived. When the victim came inside, Christina saw blood on the front of the victim's shirt. Christina went into the bathroom with the victim and saw blood on the victim's stomach when the victim removed her clothes.

On cross-examination, Christina testified that appellant had a cut on his hand in addition to the bump on his head. Appellant did not tell her how he had gotten hurt. She said she did not see any cuts or scratches on her mother when she saw the blood.

Detective James Johnson with the Lewisburg Police Department testified that he took appellant's DNA sample for this case. He presented appellant with a consent form for DNA testing, *Miranda* warnings, and a waiver of rights form. Appellant waived his rights and allowed Detective Johnson to take a DNA sample from him. Detective Johnson sent the sample to the Tennessee Bureau of Investigation ("TBI") for testing.

Detective Scott Braden with the Lewisburg Police Department testified that he helped investigate the victim's case. Detective Braden and Detective Henley went to the hospital where medical personnel performed a rape kit on the victim. Detective Henley took possession of the rape kit samples. The detectives went back to the police station, reviewed

witnesses' statements, and prepared affidavits for arrest and search warrants. The detectives obtained a search warrant for appellant's home and an arrest warrant for appellant.

After the detectives obtained the warrants, Detective Braden interviewed Christina and showed her a photographic lineup. He said Christina immediately identified appellant. Christina said that she was 100% sure that appellant pushed her mother inside his house.

After talking with Christina, Detective Braden met with other officers and went to appellant's house. Appellant came out of his house as Detective Braden and the other officers approached. The officers took appellant into custody and transported him to the Marshall County Sheriff's Office. Detective Braden and Detective Henley searched appellant's house. They saw blood on the front porch, in the kitchen, and on appellant's bed sheets. Detective Henley photographed the inside of appellant's house while the detectives searched.

Detectives Braden and Henley went to the Marshall County Sheriff's Office after the search and met with appellant. Detective Braden advised appellant of his *Miranda* rights. Appellant waived his rights and agreed to talk with the detectives. Detective Braden asked appellant if he had been drinking, and appellant told him that he had drunk "a few beers and maybe a little bit of whiskey earlier." Appellant denied that he was intoxicated or under the influence of any drugs. He also told detectives that he understood the charges against him.

The detectives questioned appellant about what happened the previous night, and appellant said that he did not know what had happened. He told the detectives that he was at home and went to bed. He denied going to the victim's house for anything. Appellant further denied having sex with the victim or anyone else that night. He said he did not remember the victim being in his house. The detectives asked if DNA would show otherwise. Appellant then answered that he did not remember the victim being at his house; however, she might have been there. Appellant told the detectives that nobody knocked on his door that night.

Detective Braden said that he observed an injury on appellant's head during the interview. The injury, which still had dried blood on it, appeared similar to the one that Christina had described to Detective Braden. Appellant also had an injury on his hand that had dried blood on it.

Detective Henley testified that on March 6, 2010, he went to the police department and met with the operator who took the initial call and the victim. Richard, the victim's son, was with her and gave him the victim's clothes that he recovered from her bathroom. The victim identified the clothes and said that she was wearing them when appellant raped her.

Detective Henley noted that the clothes had what appeared to be blood on them. Detective Henley took the clothing to the TBI lab for testing.

Detective Henley was present when Detective Johnson took appellant's DNA sample. Dr. Cheryl Johnson at the Marshall County Medical Center emergency room gave the victim's rape kit samples to Detective Henley on March 6, 2010. He transported appellant's DNA sample and the DNA samples from the victim's rape kit to the TBI laboratory in Nashville, Tennessee.

Detective Henley said that "[t]he victim was very reserved, sort of withdrawn, [and] very nervous" when he spoke with her. She was not forthcoming with information, and he "had to kind of pull a lot out of her." After speaking with the victim, Detective Henley called Detective Braden. The detectives went to Jessica's house, and the victim requested to speak with Detective Henley again in private.

After speaking with the victim again, Detective Henley went to appellant's home to execute the search warrant. Appellant was home when the detectives arrived, and the detectives took him into custody. Detective Henley searched and photographed appellant's house. Detective Henley found and photographed what appeared to be a drop of blood on the driveway between the victim's house and appellant's. He said the red drop on the driveway was consistent with the red drops found on appellant's porch and the path that the witnesses said appellant traveled. Detective Henley also photographed red drops on the victim's front porch and front door. There were also red spots on appellant's bed linens. Detective Henley took the bed linens but did not have the TBI lab examine them.

After searching appellant's home, Detective Henley went to the jail and spoke with appellant. Detective Henley corroborated Detective Braden's testimony about their discussion with appellant. Detective Henley recalled that appellant said that he had not been at the victim's home the night of the rape.

On cross-examination, Detective Henley testified that he did not test the red spots that he saw on appellant's porch, the driveway, and at the victim's house. He said that based on his experience, he thought the drops were blood, but he could not positively identify them. The TBI lab only tested the substance on the victim's clothing and the rape kit.

Detective Henley remembered that a piece of cardboard covered appellant's bedroom window. He said that whether someone could exit the house through the window "would depend on the person." Detective Henley stated that appellant's bedroom was cluttered, and there was not a clear walkway out of the room. However, he agreed that it would not take more than a few seconds for someone to get from the bed to the doorway.

Agent Jennifer Shipman with the TBI crime laboratory identified the victim's clothes that Detective Henley brought to her lab, the samples from the victim's rape kit, and appellant's oral swabs. When she received the samples, she took the victim's blood sample, applied it to a swatch card, dried it, and put in a sexual assault kit for testing. She tested the vaginal swabs in the victim's rape kit for the presence of semen, and they tested negative. Likewise, she did not find any semen present in the victim's oral swabs, vaginal swabs, or on the victim's clothing. She said that the lack of semen did not mean that there was no penetration; it simply meant there was no semen left. On cross-examination, she testified that the converse was possible: that no semen could mean that there was no penetration.

Agent Shipman said several spots on the victim's clothing "tested presumptive positive for the presence of blood." She said that when she tested for blood, she looked for "a distinctive reddish-brown stain." If present, she performed a chemical color change test. If the sample changed color, it was blood. Agent Shipman would then extract DNA from the areas that tested positive as blood. She amplified the DNA and ran it through an instrument to obtain a DNA profile. Agent Shipman identified her "Official Serology/DNA Report." The report showed that blood on the front and back of the victim's clothing was appellant's.

After the State rested its case-in-chief, the defense moved for a judgment of acquittal on the aggravated kidnapping counts based on *State v. Anthony*[2] and *State v. Dixon*[3]. The defense argued that "any sort of holding was during the commission of the rape. On that basis, there would not be a separate aggravated kidnapping." The court found that, viewed in the light most favorable to the state, appellant pulled the victim into the house and pulled her into the kitchen. The court found that "it could be argued" that the detention was beyond that necessary to accomplish the alleged rape.

The appellant waived his right to testify. After deliberating, the jury found appellant guilty on all counts. The trial court merged the aggravated kidnapping counts with each other and merged the rape counts with each other. The court sentenced appellant to serve twelve

[2] *See State v. Anthony*, 817 S.W.2d 299, 306 (Tenn. 1991) (holding that dual convictions for armed robbery and aggravated kidnapping violated the due process guarantees of article I, section 8 of the Tennessee Constitution when the confinement, movement, or detention of the kidnapping were "essentially incidental" to the robbery) *overruled by State v. White*, 362 S.W.3d 559, 578 (Tenn. Mar. 9, 2012).

[3] *See State v. Dixon*, 957 S.W.2d 532, 534 (Tenn. 1997) ("The *Anthony* decision should only prevent the injustice which would occur if a defendant could be convicted of kidnapping where the only restraint utilized was that necessary to complete the . . . robbery.") *overruled by White*, 362 S.W.3d at 578.

years for each merged count concurrent with each other for a total effective sentence of twelve years.

On December 9, 2010, the trial court entered judgments reflecting appellant's convictions and sentences and set the not-yet-filed motion for new trial for a hearing on January 19, 2011. Appellant's counsel filed a motion for new trial on January 19, 2011. During the hearing, appellant's counsel orally informed the court that he had filed the motion and asked the court the excuse the late filing. The trial court allowed the late filing of the motion with no objections from the State. After hearing arguments on the motion for new trial, the trial court denied the motion on the merits. Appellant appeals his convictions to this court.

## II. Analysis

On appeal, appellant argues that the evidence was insufficient to sustain his convictions and that the trial court erred when it failed to merge his aggravated kidnapping conviction with his rape conviction. The State responds that appellant's notice of appeal is untimely because he filed his motion for a new trial after the mandatory thirty-day period and thus, has "waived the opportunity to argue any issues that were or should have been presented in his motion." In the alternative, the State argues that the evidence was sufficient to sustain appellant's convictions and that the movement and confinement of the victim were beyond that necessary to accomplish rape.

Pursuant to Rule 33(b) of the Tennessee Rules of Criminal Procedure, a motion for a new trial "shall be in writing . . . within thirty days of the date the order of sentence is entered." This court has previously concluded that the uniform judgment document constitutes the order of sentence for purposes of Rule 33(b). *State v. Stephens*, 264 S.W.3d 719, 728-29 (Tenn. Crim. App. 2007). Thus, in the instant case, we look to the date of the filing of the uniform judgment documents to determine when the thirty-day period for filing a motion for new trial commenced. The uniform judgment documents for appellant's convicted offenses were filed on December 14, 2010. The appellant did not file his motion for new trial until January 19, 2011, more than thirty days after entry of the order of sentence.

Although the trial court agreed to hear the late filed motion for new trial, the thirty-day provision in Rule 33(b) is jurisdictional and may not be extended. *Id.* at 728; *see* Tenn. R. Crim. P. 45(b) (specifically excluding time for filing a motion for new trial from those periods that the court may extend in its discretion). "The fact that a trial judge erroneously considers and rules upon a motion that has not been timely filed does not validate the motion[.]" *State v. Dodson*, 780 S.W.2d 778, 780 (Tenn. Crim. App. 1989). Appellate courts do not have authority to waive untimely filing of a motion for new trial. Tenn. R.

Crim. P. 33(b), 45(b). *State v. Patterson*, 966 S.W.2d 435, 440 (Tenn. Crim. App. 1997). Therefore, we must conclude that appellant did not timely file his motion for new trial.

On appeal, appellant challenges the sufficiency of the convicting evidence and the trial court's failure to merge his conviction for aggravated kidnapping with his rape conviction. However, "[f]ailure to file a timely motion for new trial will result in the waiver of all appellate issues that would result in the granting of a new trial." *State v. Corey Dwan Jordan*, No. M2007-02675-CCA-R3-CD, 2009 WL 902155, at *1 (Tenn. Crim. App. Apr. 3, 2009) (citing *Dodson*, 780 S.W.2d at 780; *State v. Williams*, 675 S.W.2d 499 (Tenn. Crim. App. 1984)). If appellant had timely filed his motion for new trial and we concluded that from the evidence in this case, a properly instructed jury could have found either that the restraint of the victim was merely incidental to the rape or that it was not incidental to the rape, the relief would be to reverse the conviction and remand for a *new trial*. *See State v. Michael L. Powell and Randall S. Horne*, No. E2011-00155-CCA-R3-CD, 2012 WL 1655279, at *9 (Tenn. Crim. App. May 10, 2012) (interpreting *State v. White* to mean that when a jury was "not properly instructed on the question of whether the removal or confinement of the [victims] was essentially incidental to an accompanying felony, the Defendants' convictions of especially aggravated kidnapping must be reversed and the Defendants must be afforded a new trial on the especially aggravated kidnapping charges"). *White* requires that "juries return kidnapping convictions only in those instances in which the victim's removal or confinement exceeds that which is necessary to accomplish the accompanying felony." *White,* 362 S.W.3d at 578. The facts in this case are clearly open to two different interpretations with respect to whether appellant "substantially interfered" with the victim's liberty. Accordingly, if the motion for new trial had been timely, the proper remedy would be to remand for a new trial on the aggravated kidnapping conviction. However, we cannot do so because appellant waived his new trial right by the untimely filing of the motion. Accordingly, we deem all issues waived on appeal except sufficiency of evidence and sentencing. Tenn. R. Crim. P. 33(b); *State v. Vaughn*, 279 S.W.3d 584, 593 (Tenn. Crim. App. 2008).

"In order to secure review of issues relating to the sufficiency of the evidence and sentencing, a timely filed notice of appeal must occur, or a waiver of the timely filed notice of appeal must be sought and obtained in this court." *State v. Massengill*, No. E2006-02602-CCA-R3-CD, 2008 WL 2019462, at *2 (Tenn. Crim. App. May 12, 2008). Appellant had thirty days from the date of entry of the judgment from which he appeals to file a notice of appeal. *See* Tenn. R. App. P. 4(a). Because the motion for new trial was untimely, the date for filing a timely notice of appeal was thirty days from the December 14, 2010 judgments. *See* Tenn. R. App. P. 4(c). In this case, the appellant did not file his notice of appeal until February 4, 2011. Appellant clearly did not timely file the notice; however, unlike the procedure involving the motion for new trial, the time for filing the notice of appeal to this

court is not jurisdictional. *See id*; *Dodson*, 780 S.W.2d at 780. This court may waive the notice of appeal time requirement in the "interest of justice." *See* Tenn. R. App. P. 4(a).

Consequently, this court must determine whether we should waive the deadline in the interest of justice. "'In determining whether waiver is appropriate, this court will consider the nature of the issues presented for review, the reasons for and the length of the delay in seeking relief, and any other relevant factors presented in the particular case.'" *State v. Rockwell*, 280 S.W.3d 212, 214 (Tenn. Crim. App. 2007) (quoting *State v. Markettus L. Broyld*, No. M2005-00299-CCA-R3-CO, 2005 WL 3543415, at *1 (Tenn. Crim. App. Dec. 27, 2005)). "Waiver is not automatic and should only occur when 'the interest of justice' mandates waiver. If this court were to summarily grant a waiver whenever confronted with untimely notices, the thirty-day requirement of Tennessee Rule of Appellate Procedure 4(a) would be rendered a legal fiction." *Id*. (citing *Michelle Pierre Hill v. State*, No. 01C01–9506–CC–00175, 1996 WL 63950, at *1 (Tenn. Crim. App. Feb.13, 1996).

Initially, we note that appellant has not requested this court to accept the late filed notice of appeal in the interest of justice. His brief does not contain any explanation, argument, or discussion regarding the untimely filing of the notice of appeal. Furthermore, appellant did not respond to the State's argument that this court should dismiss the appeal. All of these factors weigh against waiver of the timely filing of the notice of appeal in this case. Moreover, after reviewing the record and applicable law, we conclude that the evidence was sufficient to convict appellant of rape[4]. Accordingly, we conclude that the "interest of justice" does not require us to waive the timely filing of the notice of appeal. We therefore dismiss the appeal.

## CONCLUSION

Having concluded that the motion for new trial and the notice of appeal in this case were untimely and that the interest of justice does not require a waiver of the timely filing of the notice of appeal, we dismiss the appeal.

_____
ROGER A. PAGE, JUDGE

---

[4] With respect to the aggravated kidnapping conviction, we cannot conclude beyond a reasonable doubt that the outcome of the jury trial would have been the same if the jury had been charged properly. *State v. White,* 362 S.W. 3d 559, 580 n.20 (Tenn. 2012). The determination of whether appellant's removal or confinement of the victim constituted a substantial interference of the victim's liberty greater than that necessary to commit the rape would be a question of fact for the jury to resolve. *See Michael L. Powell and Randall S. Horne*, 2012 WL 1655279, at *9.